**In re James A. NORRIS, Jr., Debtor.**

**Bankruptcy No. 95BK–30087–A7.**

United States Bankruptcy Court,
W.D. Louisiana,
Monroe Division.

June 15, 1995.

John C. Anderson, Baton Rouge, LA, for debtor.

Bernard S. Johnson, Shreveport, LA, for petitioning creditors.

Stephen Katz, Bastrop, LA, for Trustee Billy Vining.

**440**

### REASONS FOR DECISION

HENLEY A. HUNTER, Chief Judge.

These matters came on for trial on May 11, 1995, on the: 1) Involuntary Petition filed by the law firm of Johnson & Placke, Don H. Johnson, and Allan L. Placke, and 2) the Trustee's Motion for Turnover. This is a Core Proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 22.01 incorporated into Local Bankruptcy Rule 1.2. No party at interest has sought to withdraw the reference to this Court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to these reasons, an Order for Relief will be entered on the Involuntary Petition pursuant to 11 U.S.C. § 303 and Federal Rule of Bankruptcy Procedure 1013. Further, the Trustee's Motion for Turnover will be granted pursuant to 11 U.S.C. § 542.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

James A. Norris, Jr., is an attorney practicing in West Monroe, Louisiana. Formerly, he served as the District Attorney for Ouachita and Morehouse Parishes. Norris was also a member of the law firm Norris, Johnson, Placke & Foley in West Monroe, Louisiana. Foley withdrew from the firm on December 31, 1986. On June 16, 1989, without prior notification to his partners, Norris apparently withdrew $525,977.81 of the partnership funds on deposit at various banking institutions. Shortly afterwards, Johnson and Placke filed a lawsuit for an accounting, restoration of funds unilaterally paid on partnership debts, depleting the firm's capital, and for damages. This suit was filed in the Fourth Judicial District Court, Ouachita Parish, Louisiana. Norris subsequently filed an answer and reconventional demand. Norris also sought dismissal of the plaintiffs' demands and partition of immovables allegedly owned by the individual partners and their wives. Plaintiffs filed a motion for summary

judgment and sought dismissal of the partition demand and cancellation of a notice of lis pendens filed by Norris.

The trial court granted the motion. On appeal, the summary judgment was affirmed. *Johnson & Placke v. James A. Norris, Jr.,* 571 So.2d 702 (La.App.2d Cir.1990), *writ denied,* 573 So.2d 1142 (La.1991). Ultimately, the matter proceeded to trial in the state court. On September 30, 1994, written reasons for decision were filed whereby the plaintiffs obtained a judgment against Norris for $525,977.81 together with the legal rate of interest from June 16, 1989, until paid. The judgment was subject to a credit in the amount of $144,462.33, together with interest thereon from July 1, 1989.

Judgment was further rendered in favor of Johnson & Placke for $57,923.40 plus interest at the legal rate from August 31, 1989. In addition, judgment was rendered in favor of Don H. Johnson and Allan L. Placke each for $30,000.00 plus legal interest from August 31, 1989. The court also assessed Norris with the costs, including expert witness fees. The judgment was signed on October 6, 1995. In its rendition, the state court stated that "the actions and maneuvers undertaken by Norris to maximize his financial position to the exclusion of his law partners, were clearly deliberate and clandestine." *Written Reasons for Judgment,* p. 24, September 30, 1994. A devolutive appeal followed to the Second Circuit Court of Appeal, but Norris did not suspensively appeal the judgment. Thus, it became final for purposes of execution.

The successful plaintiffs filed this involuntary petition on January 31, 1995. The United States Trustee was directed to appoint an interim trustee by order of this Court dated February 8, 1995. Mr. Billy Vining was appointed on that date. On February 22, 1995, Norris filed a "Motion to Dismiss and/or Abstain." Alternatively, Norris requested this Court to suspend further proceedings until the appellate process was concluded. Norris further sought to have a bond posted to indemnify him should this petition be dismissed.

A hearing was held on the Motion to Dismiss on April 5, 1995, whereby the motion

was denied. All other relief sought by Norris was deferred to the trial on the involuntary petition. The Court *sua sponte* lifted the automatic stay to permit the prosecution of the appeal, including the answer to the appeal filed by the petitioning creditors. However, the Court prohibited the enforcement of the judgment pending further orders. On April 24, 1995, Norris filed an answer to the involuntary petition.

On April 27, 1995, the Trustee filed a Motion for Turnover directing Norris to turnover "cash in the amount of $490,000 to $500,000 in one hundred dollar bills of the currency of the United States of America, as property of the bankruptcy estate...." An expedited hearing was set for the same date as the trial on the involuntary petition. With the consent of the parties, the trial on the Involuntary Petition and the Trustee's Motion for Turnover were consolidated for evidentiary purposes. The trial was conducted on May 11, 1995.

## I. SUMMARY OF THE EVIDENCE

### A. Mr. Norris

Norris had apparently enjoyed some success in his private practice as well as his election to public office. In fact, he testified that he earned approximately $100,000.00 to $200,000.00 annually. Before the above-mentioned events transpired, Norris also possessed substantial immovables and movables with virtually no debt or encumbrances on such property. However, prior to the entry of the state court judgment, Norris began to borrow heavily from his relatives and one commercial lender thereby encumbering most, if not all, of his known assets.

More specifically, on January 25, 1994, Norris and his wife borrowed approximately $150,000.00 from a commercial lender. In exchange, Norris and his wife granted a mortgage on their home, which was previously unencumbered. Exhibit P–1. Although the documents exhibit that the mortgagee/lender was Louisiana Bank of Ouachita Parish, Louisiana, Norris testified that the mortgage was held by Deposit Guaranty. This note, which totals $150,000.00 plus inter-

est, was due in monthly installments with the final payment due February 1, 2009.

Later, on January 31, 1994, Norris and his wife executed a collateral mortgage affecting various immovable property, timber, and mineral interests located in Lincoln, Union, Sabine, and Vernon Parishes, Louisiana, as security for a bearer note in the amount of $400,000.00. Exhibit P–2. This note was payable on demand with a stated interest rate of twelve (12) percent. On the same date, by a "Possessory Collateral Security Agreement," Norris and his wife executed a Collateral Mortgage Note in the amount of $200,000.00 and a Promissory Note in the amount of $60,000.00. The holder of both notes was Norris' cousin, John Graham Norris, Jr. Exhibits P–5, P–6, and P–7. The $60,000.00 note reflects "interest at a variable rate, beginning with four percent (4%) per annum and to change from time to time to be equal to the interest rate payable by Louisiana Bank of Ouachita Parish on 6 months certificates of deposit." Payments "shall be imputed first to payment of interest and thereafter to principal." No payment date was stated in the document. The Collateral Mortgage Note bears a twelve (12) percent interest rate.

On February 4, 1994, another collateral mortgage was executed by Norris and his wife affecting immovable property, farm products, and mineral interests in Ouachita Parish, Louisiana. Exhibit P–3. This mortgage secured another demand note in the amount of $350,000.00, at twelve (12) percent interest, made payable to bearer. On October 7, 1994, Norris and his wife executed yet another collateral mortgage to secure a demand note for $100,000.00, affecting the same property described in the February 4, 1994, collateral mortgage. *See* Exhibit P–3. This was also payable to bearer at twelve (12) percent interest. Exhibit P–4.[1]

In early 1994, Norris acknowledged borrowing $145,000.00 from Louisiana Bank/Deposit Guaranty, $300,000.00 from his mother, and $60,000.00 from his cousin, John Graham Norris, Jr. These loan proceeds were deposited into an account at Louisiana National

---

1. In Louisiana, mortgages may secure future obligations. LA.CIVIL CODE art. 3298.

Bank. Later, Norris withdrew the entirety of the funds, converted them into currency, and placed them in a safe-deposit box. Norris explained that he wanted to renovate his home. He also testified that he needed the funds available to post a cash bond if the pending state court lawsuit was decided adversely to him.[2] From February to October 1994, the funds sat idle in the safe-deposit box at Louisiana National Bank earning no interest. The renovations were not commenced until the fall of 1994, after the trial court filed its reasons for decision. Norris maintained that approximately $5,000.00 to $10,000.00 of the currency was then "taken out" and expended on "different things." Norris described these expenditures as "living expenses." Norris explained that his wife normally maintained the checkbooks, but he carried and spent cash. However, he could not recall a specific purchase from these funds. Moreover, Norris produced no records regarding these transactions.

On or about October 1, 1994, after the state court reasons were filed, Norris testified he went to the bank around noon, removed all of the remaining currency in the safe-deposit box, and placed it in his briefcase. Norris recalled no other destinations that date. However, if he had stopped, it would have been at his "office or the grocery store." After he arrived at his residence,[3] Norris recalled leaving his briefcase containing the money in his bedroom. Norris had no recollection if his family was at home; only that he set the briefcase in his bedroom.

Later that weekend, either on Saturday or Sunday, Norris claimed to have incinerated the currency. Norris did not remember the time of day of this alleged incident, only that it was "daylight." Further, Norris had no recollection of when or if he saw his family or any other persons that weekend. Nevertheless, he claimed to have carried the money from the bedroom to the carport, removed it from the briefcase, and placed it in a five gallon plastic bucket.[4] The funds were in one-hundred dollar denominations bound by wrappers and bands. Norris stated that there were either 4,900 or 4,950 one-hundred dollar bills. Four of the five bundles were encased in plastic covers. Norris proceeded to remove the wrappers and "layered" some bills into the bucket, "rounding" them and "fanning" them out as necessary so that they would be "flat." Others, he simply "stacked." Norris was unsure just how long this task required, but estimated around five to ten minutes. When Norris was finished, he approximated the bucket was less than one-half (½) full.

Next, Norris claimed to have poured approximately one gallon, or what could have been one-half (½) to one and three-fourths (1¾) gallons of gasoline over the currency. Norris then pushed down on the money with his hand. Evidently, Norris had not thought of his own personal safety in using and storing gasoline so close to the open flames of the hot water heaters and furnace.[5] He testified later that he cleaned his hand with some "stuff" he kept in the carport, entered the house, and used the bathroom. Norris stated that he did not plan to stay in the house "that long." However, Norris vividly remembered his concern about leaving the money on the carport since it was partially

---

**2.** At the hearing on the motion to dismiss, Norris testified that he made a phone call to some person at the office of the state clerk of court concerning the requirements for filing a bond. He evidently concluded from that conversation that only a cash bond would suffice. Later, he made another call to an insurance agent inquiring about a bond. These efforts were perfunctory at best.

**3.** The Norris residence is located outside the city limits of West Monroe, Louisiana. Norris stated there is presently a regulation prohibiting the burning of trash in the area. He personally never burned his "stuff" except for the currency.

**4.** The bucket Norris allegedly used to soak the currency was similar to those containing washing powder. However, he explained that the one used in this enterprise was different since there was no label.

**5.** Two hot water tanks and a furnace were located in a storage room off the carport, which Norris called the "furnace room." A vented door leads into such room. Norris stated that the hot water heaters were four to five feet inside the room. The furnace, which was replaced in the late 1994 remodeling, was eight to ten feet from the door. Gasoline was stored in two plastic containers on a metal bookcase or shelving unit close to this room.

visible from the street. Since no one else was home or expected, so he thought, the money would be "O.K." However to be safe, Norris placed the bucket near a tractor and other "junk" concealing it from open view. Again, Norris had no recollection of the whereabouts of his family or if he was expecting them. He insisted that he must have known where they were at the time. After using the bathroom, Norris took the bucket "back out" and "kind of stood there and looked at it" for a short time. At trial, however, Norris acknowledged that he initially stated he "sat around" in a folding chair and gazed at the money during an earlier deposition.

Norris then carried the bucket containing the gasoline soaked currency to an area adjacent to his driveway, where two fifty-five gallon barrels were standing on a small concrete slab. Normally used for trash,[6] Norris stated he removed the lid from one of these barrels, placed it on the ground, "dumped the gas and money into the barrel," and then "sort of tossed and rolled the bucket back toward the patio." The area where the barrels were located is depicted in photographs filed as Exhibits P–13 and P–14.[7] Norris specifically recalled dumping the contents of the bucket into the barrel then standing on his left side as he faced his neighbor's yard. The barrel contained no other trash other than some insignificant residue. The other barrel stood to Norris' right.

Norris then struck a match and threw it in the barrel. This immediately ignited the contents creating a "woooooh" sound, according to Norris. Norris stated the noise was not like the sound of a firecracker and was not "real loud." Norris also asserted that the flames "went up ten to fifteen feet high," but quickly subsided. Norris testified that he quickly became concerned about his lawn when some gasoline leaked from the seams around the bottom of the barrel and ignited

on or near his grass. Exhibit P–11(a) depicts the barrels, but Norris claimed they were in a different position on the date of the alleged incident. The other barrel, then on his right, had holes along the bottom for drainage. However, the barrel he claimed to have used to ignite the currency lacked such drainage holes.

Norris watched the blaze briefly. He then started to look for a way to extinguish the flames. He searched unsuccessfully for a garden hose in three separate locations. He saw a fifty pound paper bag full of "deer corn." The bag possibly contained an plastic liner, according to Norris. At that point, Norris recalled hearing the distinctive sound of the muffler on a vehicle belonging to his neighbor's son, Jim Wainwright. Jim Wainwright was a client of Norris. Next, Norris hauled the bag of deer corn from the carport to the barrels. Norris did not have a knife, so he attempted to tear the bag with his hands. Succeeding in that effort, he placed his hand under the sack and balanced it with the other hand until the sack was over the barrel. The deer corn emptied from the bag quickly, making a "whoooooh" sound. Norris carefully prevented the paper sack from catching fire as he dumped the "first half" into the barrel.

As the deer corn completely smothered the fire, Norris remembered feeling the heat emanating from the barrel. He went "back" to the carport for welding gloves and a shovel which he used with his barbecue smoker. Norris then looked into the barrel, but could not see any currency since it was covered by the deer corn. He then attempted to stand the shovel "upright," but the corn continued to obstruct his view of the contents. Later, he set the shovel down and attempted to touch the barrel with his gloves. Since Norris feared the heat may "go through" the gloves, he waited approximately "two to five minutes." At the May 1, 1995, deposition,

---

6. Norris testified that he had never burned his trash in these barrels. He occasionally dumped "hot coals in the garbage barrels" from his barbecue smoker, but always used a bucket. Norris explained to the Court that he used the barbecue smoker quite often, especially around Christmas and other holidays.

7. The Court notes a low brick wall running along the driveway toward the house. Approximately the upper one-third ($\frac{1}{3}$) of the barrels is visible over the wall. Also, a chain link fence is evident which stands between Norris' yard and that of his neighbors. The fence terminates a short distance from the concrete pad.

Norris described turning the barrel over on its side, looking at the bottom, and seeing nothing but ashes. Exhibit P–19, p. 17, lines 3–6. At the trial, however, Norris testified he examined the contents by prodding them with his shovel, whereby the barrel was in an upright position. The deer corn and the residue from the currency remained in the barrel until the garbage men dumped the contents. The bucket used to soak the currency was retained until a later date. Norris claimed to have placed hot coals in it from his smoker, thus causing it to melt. Afterwards, Norris discarded the bucket.

Roughly around the date of this alleged fire, Norris prepaid twelve or thirteen monthly payments on the note to Louisiana Bank/Deposit Guaranty. The amount paid was approximately $18,000.00. Consequently, that debt would not become "due" until October 1995. On October 7, 1994, Norris and his wife executed yet another collateral mortgage to secure a demand note for $100,-000.00, affecting the same property described in the February 4, 1994, collateral mortgage. *See* Exhibit P–3. This was also payable to bearer at twelve (12) percent interest. Exhibit P–4. Moreover, Norris acknowledged borrowing another $40,000.00 from his mother and $40,000.00 from his cousin. He also paid $60,000.00 due the Internal Revenue Service ("IRS") and taxes owed to the State of Louisiana.

Norris also purchased a Mercedes–Benz automobile for his wife. Norris explained that he received a settlement from his wife's automobile accident which resulted in a total payout of $30,000.00 to $31,000.00. With these proceeds, the mortgage on the original vehicle held by Volvo in the approximate amount of $17,000.00 was paid together with a second lien held by Norris' mother. Using the remainder of the settlement funds and other monies from a sale of "some stock," Norris bought the Mercedes–Benz. Norris also began extensive renovations on his residence in October or November 1994. Norris acknowledged that the remodeling likely commenced after the judgment was entered by the state court. These costs were paid by cashiers checks issued by either Central Bank or possibly Louisiana Bank. He explained that he did not delay the remodeling since his wife had been "counting on it being done." Further, Norris did not want to tell his wife that he was unable to remodel the house after he burned the money.

In December 1994, Norris was summoned to a judgment debtor's examination in state court. Judge Sharp, the presiding judge, asked Norris about the location of the currency. In his answers, Norris testified that he "spent" the money. Specifically, Norris answered as follows:

Q: All right, and you've now removed all that cash from there, is that right?

A: That is correct.

Q: And where did you take that cash?

A: *Well, it was removed and spent.*

Q: Spent on what?

A: Well if you want to get—I can go back when I get all of the information and I can tell you in more detail exactly what I've done with what monies.

Q: How can you do that? What would you look at that would tell you where you spent the cash?

A: Go back and look at records.

*Judgment Debtor's Examination,* December 7, 1994, at p. 27, lines 17—p. 28, line 3 (emphasis added).

Shortly thereafter, Norris responded:

Q: Where is the cash, the currency that you had?

A: Well I've got some at Central but I'm not even sure how much at this point.

Q: No, the dollar bills, the greenbacks, the stuff that you had in the safe deposit box, where is that now?

A: *It's been spent?*

Q: *All of it?*

A: *Yes.*

*Judgment Debtor's Examination,* December 7, 1994, at p. 31, lines 24—p. 32, line 5 (emphasis added).

Notwithstanding, during a later deposition on May 1, 1995, Norris asserted that he used the term "spent" to convey both "it's gone" and that the money was "burned." Norris explained at trial in this Court that he used this term to mean "used up," "rendered use-

less," "exhausted," and "consumed." He verified this usage by consulting the "American Meridian Dictionary" published by Houghton–Mifflin Company, and Black's Law Dictionary. Norris brought these volumes, or copies of the definitions contained therein, to the trial in his briefcase.

On December 16, 1994, Norris appeared in state court at a contempt hearing for his failure to comply with an order of the court.[8] At this hearing and quite possibly an earlier one as well, Norris asserted the privilege against self-incrimination as to both federal and state law. At the December 16, 1994, hearing, Norris testified about his efforts to obtain immunity from state and federal prosecutors. However, he refused to explain the nature of the criminal prosecution he faced at the time. An Application for Immunity was filed by the United States Attorney on March 16, 1995. An order was signed by the District Court granting Norris immunity on the same date. By the date of trial in this Court, Norris had also obtained immunity from the District Attorney.

At trial, Norris maintained that he needed immunity from both due to: 1) his fear that he would be prosecuted for the destruction of United States currency under federal law and 2) the possibility of prosecution by his wife for the destruction of the currency under the Louisiana Criminal Code provisions related to criminal damage to community property. Norris acknowledged that he was the District Attorney for Ouachita and Morehouse Parishes from 1985 to 1990. Norris "selectively" practiced criminal law ever since that time. However, on cross-examination, he could not explain his apprehension of charges for aggravated criminal damage to property or simple damage to property, since both excluded fire or explosion. *See* LA.REV. STAT. §§ 14:55, 14:56 (1995). Norris' only rationalization was that in his "mental state," he believed there could be some "exposure." Moreover, although Norris consulted two dictionaries concerning the definition of the word "spent," he admitted that he had not reviewed the Louisiana Criminal Code provisions in quite some time.

Norris insisted that the petitioning creditor's photographs of the site and the barrels, taken shortly after the hearing on the Motion to Dismiss held on April 5, 1995, distorted the scene. He asserted that the photographs created an "optical illusion" inasmuch as it appeared that foliage from nearby plantings extended over the barrels. *See* Exhibit P–11(A). Norris contended that the tree limbs were actually a "foot or two" from the barrels at the time the photographs were taken. Further, the barrels were approximately the same distance from the ligustrum bush. In October 1994, Norris claimed the "little scrubby oak" did not extend as far as the photograph suggested. He maintained that in the interval, the oak began to lean over, since its growth was stunted due to its proximity to the larger tree. He estimated the age of the smaller tree at four or five years. Norris also stated that he measured the distance between the smaller and larger trees at six inches.

The branch depicted in the photographs extended from a small oak tree which grew along the fence line. Curiously, this branch was removed by Norris sometime between the earlier hearing in this Court on April 5, 1995, and the trial on the merits. In fact, Norris cut down the entire tree. The removal was part of a general "cleaning" along the fence line in what Norris described as a "flower bed." Queried as to what prompted Norris to cut down the tree, he explained that the whole "flower bed had grown up badly with honeysuckle and poison ivy." Therefore, he "cleaned it out." Norris professed that "it was not an issue ... anyone wanting to know if there was a fire would look at the ligustrum." He "was just trying to get the yard cleaned up." Norris later opined that there would have been no argument if "it" had still been there, presumably referring to the tree. Further, Norris claimed that the heat from the fire affected

8. LA.REV.STAT. § 13:3862 (1995) provides that on ex-parte motion of a party who has caused a writ to be issued for the seizure of property, the court may order that money or other property of the person or the party against whom a writ is di-rected or otherwise in his possession or control be delivered to the sheriff on personal service of the order. Failure to comply may be punished by contempt.

the ligustrum bush situated to the left side in Exhibit P–11(A). He also "snipped" limbs from this shrub during the cleanup.

An examination under Federal Rule of Bankruptcy Procedure 2004 was scheduled for Monday, May 1, 1995, at the office of the attorney for the petitioning creditors. On Saturday, April 30, at approximately noon, Norris placed a call to the residence of Mr. Stephen Katz, Counsel to the Trustee. Mr. Katz was working in his own yard, but came inside to speak to Norris. Norris testified he informed Mr. Katz that he had trimmed the foliage in the vicinity of the barrels, particularly the "scrawny oak." Mr. Katz had no recollection of this discussion. Apparently at the time, efforts were being made by the petitioning creditors to have the foliage inspected by a Dr. Jewell from Louisiana Tech University. Norris also stated he told Mr. Katz that he cleaned out the "whole flower bed along that fence." Norris estimated that his cleanup efforts in the yard began approximately three weeks before the May 1, 1995, deposition.

Norris introduced his own photographs to rebut the suggested "optical illusion" created by the petitioning creditors. He insisted that these photographs presented a more accurate depiction of the scene. See Exhibits N–1 and N–2. Specifically, the barrel where fire allegedly occurred was closest to the ligustrum. The tips of the bush extended to within one foot of the barrel, according to Norris' own personal measurements. The small oak stump, located to the left of the larger, intact oak tree, was six inches from the base of the larger tree. The smaller object near the fence post was a concrete "land" marker. He calculated that the stump was nine feet from its center to the concrete pad. Norris maintained that the oak tree branches were at least one or two feet from the "fire" and did not extend over the barrels. Rather, they extended over his neighbor's yard by at least two to five feet. Norris also stated he personally observed damage to the ligustrum.

### B. Other Witnesses

Mr. Jack Tarver, a commercial photographer, accompanied the attorney for the petitioning creditors to Norris' residence on April 5, 1995. Exhibits P–11(a)–(g) are photographs taken by this witness. Enlargements of Exhibits P–16 and P–17 depict an oak limb which appears in the middle of the picture overhanging the barrel. This witness had no doubt that the limb extended over barrel. In fact, he recalled pulling the limb out of the way to photograph the inside of the barrels. Mr. Tarver testified on cross-examination, however, that they actually tilted the barrels to photograph the interior. Regardless, he asserted that he could have touched the overhanging limb if he stood on the slab and "reached" for it.

Mr. Allan Placke, one of the petitioning creditors, accompanied his attorney and others to Norris' residence on April 5, 1995. He testified there were limbs overhanging the barrels by approximately six to eight feet. Mr. Placke estimated that if flames leapt fifteen feet from barrels on the concrete pad, they would have come in contact with the limbs.

The parties stipulated that Mr. Charlie Williams, if called to testify, would have stated that at the request of Mr. Katz, he went to Norris' residence on April 12, 1995, and picked up two trash barrels while Norris was present. These barrels were then placed in the back of a Ford F–150 pick-up truck and transported to CH & A, Inc., in Kingwood, Texas, for testing. A lid was placed on each barrel and they were sealed, although Norris did not observe both these actions.

Mr. Katz, Counsel to the Trustee, testified that he had no recollection of Norris ever informing him that the limbs had been cut in the Saturday, April 29, 1995, telephone conversation. Mr. Katz testified that he first discovered they had been removed sometime after the deposition on May 1, 1995. Mr. Katz also testified that he told Norris the foliage needed to be examined, but later learned that it had been pruned and removed.

### C. Expert Witnesses

The parties stipulated to the introduction of the report by CH & A, Inc. Exhibit P–10. This report summarizes the findings from an

examination of the two barrels removed from the Norris residence. It summarized that "neither of these barrels was used for the reported fire." *Id.* at p. 1. This report also concluded that no significant fire occurred in one of the barrels. The "second" barrel, or hereafter the "incident barrel," is discussed in the Analysis section of the report as follows:

> The blistering and peeling of the interior painted surface of the second barrel indicates possible exposure to damaging weather, chemicals, or heat. If the exposure was to heat, and if the source of that heat was fire, any internal fire in this barrel could not have been more than a small fire of very short duration. The paint around the interior surface has not been burned.

> A portion of the blistered paint from inside the second barrel was analyzed by infrared spectroscopy. The analysis gave an infrared spectrum consistent with an oil based or epoxy type paint (Attachment 1). This type of paint is combustible and will be consumed if exposed to prolonged heating or burning.

> Another portion of the blistered paint from inside this barrel was ignited by butane flame. The paint was observed to burn and the burning left a solid black residue.

> The analysis of the blistered paint in this barrel did not reveal any black residue or carbon in or on the paint. From a fire in which a significant quantity of gasoline or an oil/gas mixture was used as an accelerant as stated in the deposition by Mr. Norris, we would expect to find carbon deposits in the barrel with the blistered paint.

> The exterior paint on the second barrel shows no blistering or peeling, so any heat which may have been inside this barrel was not of sufficient temperature or duration to go through the steel drum and damage the exterior paint bond. We estimate that the potential heat from burning the reported quantities of paper and gasoline could reach 367,500 BTU and that the flame temperature could be in the range of 600 to 810 degrees Centigrade (1112 to 1490 degree Fahrenheit). That amount of heat would have damaged both the interior and the exterior paint.

> After the barrels were delivered, we were informed that Mr. Norris had indicated that the large rust patch on the first barrel was caused by heat from the fire in the second barrel. Since the exterior of the second barrel was not damaged by any heat or fire, it is not possible for any heat or fire which might have been inside the second barrel to have jumped across the space between the barrels and damaged the first barrel.

### CONCLUSION

> It is apparent that no fire of significance ever occurred in the first barrel. It is our opinion that the rust patch on the exterior of the first barrel could not be the result of any fire in the second barrel as claimed by Mr. Norris.

> In the second barrel, the presence of paint around the interior surface which has not yet been burned plus the absence of any significant carbon deposits are both inconsistent with the occurrence of a gasoline-based fire such as the one described by Mr. Norris in his deposition. It is our opinion that no such fire ever occurred.

> Therefore, from our examination of the two trash barrels, we conclude that neither of these barrels was used for a fire of the nature and magnitude described in the deposition dated March 30, 1995.

Exhibit P–10 (Report from CH & A, Inc., p. 4—p. 6).

Mr. Frank Johnson, of Tyler, Texas, and owner of System Engineering, testified on behalf of Norris. This witness qualified as an expert in forensic engineering, but his professional duties included fire investigations. Mr. Johnson performed an examination of the barrels and consulted a metallurgist in Baton Rouge, Louisiana, formerly associated with Professor Clifford Shelton of L.S.U. Mr. Johnson was contacted by Norris who asked him to review the CH & A, Inc., report and to perform his own analysis. The barrels were delivered to Mr. Johnson a week or ten days prior to the trial. The

petitioning creditors did not have an opportunity to review the report since it was first revealed in open court.

Mr. Johnson distinguished between metallurgy and his own field of thermodynamics. He described his investigation as focused on the characteristic effects as opposed to cause and origin. Johnson opined that the central question was whether a fire occurred in either or both barrels. After he reviewed the CH & A, Inc., report, he transported the barrels to Professor Shelton in Baton Rouge, Louisiana, so that Shelton could view them. Mr. Johnson concluded that there had been a fire in the "incident barrel." This was the same barrel Norris had indicated to him as the one where the fire occurred. Mr. Johnson then moved both barrels back to Tyler, Texas, where he continued his examination which included measurements and photographs. *See* Exhibits N–6, N–7, and N–8.

Mr. Johnson asserted that the type of barrel in question was subject to rust. He concluded that the incident barrel, shown in Exhibit N–7, evidenced considerable carbon deposits and oxidation of the interior. Paint was either completely missing or oxidized. These were characteristics of a fire in the container. Likewise, in the non-incident barrel, there appeared to have been a fire in it as well, but it exhibited much different characteristics. This barrel had vent holes around the bottom. The fire in this barrel was "very localized, very intense, but low in the barrel," according to Mr. Johnson. The incident barrel, in contrast, had no vent holes and more oxidation.

Nonetheless, Mr. Johnson did not perform the same tests as CH & A, Inc. In fact, he concurred with the temperature and estimated BTU's in that report. Mr. Johnson stated that his problem with that report was that the "application of the facts to the conclusions were flawed and he did not believe they could draw the conclusions they drew from the facts." The witness apparently based this statement on his own analysis of paint inside the barrels. He explained that his "chip test" demonstrated the paint was not bonded to the metal as it should have been.

Mr. Johnson, however, challenged Norris' description and other testimony about the alleged fire. He first questioned the height of the flames as Norris portrayed. At their maximum height, the flames would have reached eight to ten feet only momentarily, according to Johnson. In fact, on the day prior to the trial, the witness performed his own "non-scientific" test at his home. He first placed a small amount of gasoline in a trash barrel, approximately one-third (⅓) of a gallon, and ignited it. He described that there was an initial "flare up" extending six to eight feet over the top of this barrel. The flames immediately "died down," due to the lack of oxygen. Mr. Johnson explained that in a hydrocarbon fire, the amount of heat available was not transferred to the barrel because "rich fuel burns cool, and gets a tall flame at first then dies down because of no oxygen."

Mr. Johnson also recalled Norris' assertion that he poured one-half (½) to one and three-fourths (1¾) gallons of gasoline in the bucket. For the damage in the barrel to have occurred, this witness determined that a smaller amount of fuel, perhaps only a one-third (⅓) to one-half (½) gallons was used. Thus, Johnson believed that Norris' estimate of the size and life of the fire was exaggerated. He calculated the fire in the incident barrel lasted no longer than approximately three minutes. Mr. Johnson also agreed with the CH & A, Inc., report in its conclusion that no significant fire occurred in the non-incident barrel.

Moreover, since there were no drainage holes in the incident barrel, Mr. Johnson could not explain Norris' description of a fire around the bottom of such barrel which endangered the lawn. The witness suggested only that some gasoline could have been spilled in the process of pouring the gasoline soaked currency into the barrel. Thus, it could explain the small blaze that threatened Norris' grass and so alarmed him.

Mr. Johnson also opined handling gasoline in the vicinity of the "furnace room," as Norris described, was a very dangerous practice. The danger arose from the tremendous volatility of gasoline as opposed to kerosene. Even in very cold weather, gasoline had the potential to migrate across the floor which

could be ignited from a pilot light. This act posed a great risk to Norris' dwelling, his family, and him personally.

Gerald Don Coker, of Calhoun, Louisiana, qualified as a licensed landscape contractor and horticulturist. Mr. Coker testified that his professional duties included the care and maintenance of shrubbery. He also developed damage estimates caused by fire and lightening strikes. In addition, Mr. Coker stated he had experience with fire damage to ligustrums. Mr. Coker was hired by Norris to examine the ligustrum bush at Norris' residence. According to this witness, he found "tip kill" on its ends next to the barrel. He also observed no other symptoms of that condition on the plant except in the vicinity of the barrel. Exhibit N–9 depicts in a circled area the condition described by Mr. Coker. He pointed out thirty dead tips on the ligustrum. *See* Exhibit N–11.

Mr. Coker also testified that there was new growth on the bush lower than the damaged area. In October, ligustrum plants were dormant. New growth extending six to eight inches would have grown since spring. Thus, the witness concluded that the damage occurred last fall. However, this damage could have occurred anytime between October through December. Lastly, the witness described the "flower bed" along the fence row as "not worked up, and not much of a bed." He observed no "flowers." He also described the general level of maintenance as "medium."

## II. THE INVOLUNTARY PETITION

### A. Procedural Requirements

In this matter, the Court first notes that the petitioning creditors must satisfy the requirements of 11 U.S.C. § 303 by the preponderance of the evidence. *E.g., In re Rubin,* 769 F.2d 611, 615 (9th Cir.1985) (petitioning creditors bear the burden of proving that the debtor is not paying its debts as they become due and that their claim is no longer the subject of a bona fide dispute); *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (noting that the preponderance standard generally applies in civil actions between private litigants).

### 1. Who May Be Subject To An Involuntary Petition

11 U.S.C. § 303 empowers creditors to initiate a bankruptcy case against a debtor by filing an involuntary petition. An involuntary petition may be filed only against an eligible debtor, only under Chapter 7 or Chapter 11, and only by the appropriate number of eligible creditors holding qualified claims of the requisite value.

11 U.S.C. § 303 states:

(a) [a]n involuntary case may be commenced only under chapter 7 or 11 of this title, and only against a person, except a farmer, family farmer, or a corporation that is not a moneyed, business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced.

With two exceptions, an involuntary case may be filed against any debtor who is eligible for voluntary bankruptcy under the chapter chosen. Notably, these exceptions, not applicable here, include farmers and corporations that are not "moneyed, business, or commercial." 11 U.S.C. § 303(a).

### 2. The Petitioning Creditors' Claims

■ Section 303(b), as amended by the Bankruptcy Reform Act of 1994, dictates who may file an involuntary Chapter 7 or 11 case against an eligible debtor. The statute provides:

(b) [a]n involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indentured trustee representing such holder, if such claims aggregate at least $10,000 more than the value of any lien on property of the debtor securing such claim held by the holder of such claims;

(2) If there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee or a

transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,000 of such claims. . . .[9]

11 U.S.C. § 303(b).

While the language of the statute may seem clear, much of the litigation in contested involuntary cases entails who qualifies as a petitioning creditor and how many creditors are required to file the petition. Specifically, if there are at least twelve such eligible creditors holding qualified claims,[10] three or more entities [11] must participate in filing the petition if they hold claims with an aggregate value of $10,000.00 in excess of the value of any security. If there are less than twelve creditors, a single creditor with a claim of $10,000.00 in excess of the value of any security may file the involuntary petition. The Fifth Circuit has recently pronounced that the policy considerations for such rules are: (1) "the fear that involuntary bankruptcy might be used by one or two recalcitrant creditors as a means of harassing an honest debtor" and (2) "the possibility that the threat of an involuntary petition would be used to compel the debtor to make preferential payments to one or more litigious creditors." *In re Sims,* 994 F.2d 210, 217 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 702, 126 L.Ed.2d 669 (1994) (*quoting 2 Collier on Bankruptcy,* ¶ 303.08[12][a], p. 303–42 (1992)).

■ The general rule is that the number of creditors is to be determined as of the date the petition was filed, rather than the date of the hearing. *E.g., In re Garland Coal & Mining Co.,* 67 B.R. 514, 519 (Bankr. W.D.Ark.1986). Moreover, all creditors with claims should generally be counted in determining whether the debtor has less than

twelve creditors. *E.g., In re Atwood,* 124 B.R. 402 (S.D.Ga.1991); *In re Smith,* 123 B.R. 423 (Bankr.M.D.Fla.1990), *aff'd,* 129 B.R. 262 (M.D.Fla.1990). In contrast, some courts have held that *de minimis* recurring debts owed by the debtor should not be considered when determining the number of creditors needed to join an involuntary petition. The Fifth Circuit has apparently followed the latter line of cases. *Denham v. Shellman Grain Elevator, Inc.,* 444 F.2d 1376, 1378–79 (5th Cir.1971) (decided under the Bankruptcy Act of 1898). *See In re Runyan,* 832 F.2d 58 (5th Cir.1987) (even if *de minimis* claims can be excluded, $600.00 to $800.00 claims are not *de minimis* ).

In this case, the parties have stipulated that:

> the petitioning creditors comprise of three entities, each of which is a holder of a claim against Norris which is at least $5,000 more than the value of any lien on property of Norris securing such claims. (Thus, even with the 1994 amendment requiring an aggregate of $10,000 in unsecured claims, the parties agree that petitioning creditors exceed that amount).

*Joint Pretrial Stipulation,* p. 3, May 8, 1995.

Based on this stipulation, this Court finds that there are the requisite number of creditors holding unsecured claims against Norris pursuant to 11 U.S.C. § 303(b). In addition, the stipulation resolves the aggregate amount of such claims in favor of the petitioning creditors.

### 3. Claims "Not Contingent" As To Liability

■ Furthermore, to be considered a qualified claim, such claim cannot be "contingent as to liability." 11 U.S.C. § 303(b)(1). This requirement is a carryover from the

---

9. Subsection 108(b) of the Bankruptcy Reform Act of 1994 amended 11 U.S.C. § 303(b) to require that petitioning creditors in involuntary cases under Chapter 7 or 11 have aggregate noncontingent, undisputed claims of $10,000.00. The Act, which became effective on October 22, 1994, increased the dollar limit from $5,000.00 to $10,000.00. Also amended was 11 U.S.C. § 104 which provided automatic adjustments of this amount beginning on April 1, 1998 and each three year interval thereafter.

10. The term "claim" is broadly defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ..." 11 U.S.C. § 101(5).

11. An entity is defined as a "person, estate, trust, governmental unity, and the United States Trustee." 11 U.S.C. § 101(15).

prior Bankruptcy Act § 59(b).[12] The Bankruptcy Code, however, does not define the term "contingent." Nonetheless, the Fifth Circuit has asserted:

> [a] claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship was created.

*In re Sims,* 994 F.2d 210, 220 (5th Cir.1993) (*citing In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981); *see also 2 Collier on Bankruptcy,* ¶ 303.08[11][a] (1993) ("[w]hen the duty to pay a claim does not rest upon the occurrence of a future event, the claim is not contingent")).

■ Generally, claims were considered contingent if the debtor's duty to pay depended upon the occurrence of an extrinsic event, and such triggering was reasonably contemplated by the debtor and creditor at the time the claim arose.[13] Thus, in the classic case, a tort claim for negligence would be contingent as to liability until a final judgment was entered establishing the rights of the parties. *In re All Media Properties, Inc.,* 5 B.R. at 133. Using the *In re All Media* reasoning, it is apparent that once a judicial finding of liability occurred and a judgment entered, the issue of contingency is foreclosed.[14] Moreover, the fact that an appeal is pending is irrelevant. *E.g., In re Arker,* 6 B.R. 632 (Bankr.E.D.N.Y.1980) (judgment is considered final and is not affected by the prosecution of an appeal). *See also Denham v. Shellman Grain Elevator, Inc.,* 444 F.2d at 1380; *In re Walton Plywood,* 227 F.Supp. 319.

In this case, the judgment rendered against Norris by the state court is final and executory notwithstanding its appeal. Moreover, Norris has not contested this issue or asserted that the petitioning creditors' claims are contingent. Rather, his main contention was that the claims of the petitioning creditors are subject to a bona fide dispute.

### 4. Claims Not Subject to a "Bona Fide Dispute"

■ Norris asserted that the state court judgment was "patently reversible." Further, he remained convinced in his "mind" and "heart" that the trial judge was "corrupted." Accordingly, he maintained that the petitioning creditors' claims were subject to a bona fide dispute, thus ineligible to file an involuntary petition under 11 U.S.C. § 303(b)(1). The Bankruptcy Amendments and Federal Judgeship Act of 1984 added this requirement to the Code, but Congress failed to define the term. As a result, its interpretation has been the subject of much debate.[15] Legislative history suggests that

12. With the addition of the "bona fide dispute" element in 1984, pre-amendment cases are of little usefulness or value in determining whether a claim is "contingent as to liability." *See In re Reid,* 773 F.2d 945 (7th Cir.1985) (new "bona fide dispute" element changes reasoning and result of a significant number of pre-amendment cases dealing with disputed claims).

13. *E.g., In re All Media Properties, Inc.,* 5 B.R. 126 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981). *See also In re New Mexico Properties, Inc.,* 18 B.R. 936 (Bankr.D.N.M.1982); *In re Duty Free Shops. Corp.,* 6 B.R. 38 (Bankr. S.D.Fla.1980).

14. *E.g., In re Drexler,* 56 B.R. 960, 966 n. 9 (Bankr.S.D.N.Y.1986) (utilizing the *In re All Media* definition and rationale, a judgment rendered by a state court should be considered sufficient proof of the non-contingency of the claim); *In re Schiliro,* 64 B.R. 422 (Bankr.E.D.Pa.1986) (judgment holder's claim was not considered contingent or subject to a bona fide dispute). *See Denham v. Shellman Grain Elevator, Inc.,* 444 F.2d 1376 (5th Cir.1971) (claim based on judgment which fixed liability and amount did not affect requirement of former § 59(b), 11 U.S.C. § 95(b), that the claim must not be contingent); *In re Walton Plywood,* 227 F.Supp. 319 (W.D.Wash.1964) (if entire judgment was deemed to be superceded pending appeal, claims were not contingent as to liability under former § 59(b), 11 U.S.C. § 95(b)). *See also 2 Collier on Bankruptcy,* ¶ 303.08, 303–33 (15th ed. 1995).

15. *E.g., In re Stroop,* 51 B.R. 210 (D.Colo.1985) (the court relied on the same standard as that applicable to motions for summary judgment); *In re Johnston Hawks, Ltd.,* 49 B.R. 823, 830 (Bankr.D.Haw.1985) (the court defined a bona fide dispute as one in which "an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith without fraud or deceit on the other side."); *In re Hope Communications, Inc.,* 59 B.R. 939, 943–44

the language was intended to prevent creditors whose claims were legitimately disputed from using the threat of bankruptcy to force debtors to pay. 130 Cong.Rec. S7618 (daily ed. June 19, 1984) (*cited in the case of In re Cates*, 62 B.R. 179, 180–81 (Bankr.S.D.Tex. 1986)). It has also been stated that Congress wanted creditors to settle disputed claims outside of the bankruptcy setting because involuntary relief was considered a severe remedy. *In re Cates*, 62 B.R. at 180–81; *In re Hope Communications, Inc.*, 59 B.R. at 943.

■ The Fifth, Third, Seventh, Eighth, and Tenth Circuits have all adopted an objective standard based on the reasoning of *In re Lough*, 57 B.R. 993 (Bankr.E.D.Mich.1986).[16] Specifically, the proper standard requires a determination of "whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *E.g., In re Sims*, 994 F.2d at 221 (citations omitted). These cases assert that "[i]f there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, the petition must be dismissed." *E.g., B.D.W. Assoc., Inc.*, 865 F.2d at 66; *In re Lough*, 57 B.R. at 997. That is, if there are substantial factual and legal questions bearing upon the debtor's liability, a bona fide dispute exists. *E.g., In re Sims*, 994 F.2d at 221 (citations omitted).

As stated, the Fifth Circuit has adopted this objective standard, as well as the Eighth Circuit's methodology for applying it. *In re Sims* stated:

[T]he petitioning creditor must establish a prima facia case that no bona fide dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a bona fide dispute

does exist. Because the standard is objective, neither the debtor's subjective intent not his subjective belief is sufficient to meet this burden. The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute. This does not mean that the bankruptcy court is totally prohibited from addressing the legal merits of the alleged dispute; indeed, the bankruptcy court may be required to conduct a limited analysis of the legal issues on order to ascertain whether an objective legal basis for the dispute exists.

*In re Sims*, 994 F.2d at 221 (*citing In re Rimell*, 946 F.2d at 1365 (citations omitted)).

■ This test does not require this Court to determine the probable outcome of a dispute or resolve any genuine issues of fact or law. *E.g., In re Sims*, 994 F.2d at 221; *Bartmann v. Maverick Tube Corp.*, 853 F.2d at 1544; *In re Lough*, 57 B.R. at 997. Further, because the test is objective, this Court should not and will not delve into the debtor's subjective intent or belief. *E.g., In re Sims*, 994 F.2d at 221 (citations omitted). However, "the bankruptcy court is not totally prohibited from addressing the legal merits of the alleged dispute" and "may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists." *In re Sims*, 994 F.2d at 221 (*citing In re Rimell*, 946 F.2d at 1365).

■ This Court is bound by the definition of a "bona fide dispute" and the objective standards of *Sims* and *Lough*. Moreover, the Court does not read this language to require a prediction of Norris' success on appeal, nor does it give it permission to undermine the validity of the state court judgment. Even though this Court has not

---

(Bankr.W.D.La.1986) (the court combined the reasoning of *Stroop* and *Johnston Hawks* to hold that the burden was on the petitioning creditor to prove that its claim was not the subject of a bona fide dispute). These differing standards were rejected by the well cited and recognized case of *In re Lough*, 57 B.R. 993 (Bankr.E.D.Mich.1986).

16. *E.g., In re Sims*, 994 F.2d 210, 221 (5th Cir. 1993); *B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66–67 (3d Cir.1989); *In re Busick*, 831 F.2d 745, 750 (7th Cir.1987);

*In re Rimell*, 946 F.2d 1363, 1365 (8th Cir.1991), *cert. denied, Rimell v. Mark Twain Bank*, 504 U.S. 941, 112 S.Ct. 2275, 119 L.Ed.2d 202 (1992); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir.1988). *See also In re Leach*, 92 B.R. 483 (Bankr.D.Kan.1988), *opinion amended*, 102 B.R. 805 (Bankr.D.Kan.1989); *In re B.B.S.I., Ltd.*, 81 B.R. 227, 230 (Bankr.E.D.N.Y.1988); *In re Garland Coal & Mining Co.*, 67 B.R. 514, 521 (Bankr.W.D.Ark.1986).

located any Fifth Circuit authority, the overwhelming majority of other courts have found that claims based on final judgments are *not* subject to a "bona fide dispute."[17] The petitioning creditors rely on the prevalently cited case of *In re Drexler,* 56 B.R. 960 (Bankr.S.D.N.Y.1986), whereby the petitioners filed an involuntary Chapter 7 petition against the debtor. Their claims arose out of two judgments from actions initiated in federal district court against the debtor. The petitioners claimed that the debtor failed to remit insurance premiums pursuant to written agreements between the parties. Several hearings were held, evidence was adduced, and the debtor admitted liability. Consequently, a "Money Judgment" was rendered against the debtor. The second and companion judgment, referred to the "Sanctions Judgment," was granted in part by default. The debtor appealed, but never requested or obtained a stay pending appeal pursuant to Federal Rule of Bankruptcy Procedure 8005.

After the involuntary case was initiated, the debtor filed an answer and numerous counterclaims contesting the petition. A trial on the involuntary petition was commenced, but was later halted when it was revealed that more discovery was required. Consequently, the petitioning creditors moved for summary judgment. The court granted such motion and concluded that a claim based on an unstayed judgment as to which an appeal had been taken was not the subject of a bona fide dispute under 11 U.S.C. § 303(b). *Id.* at 967. The court in *Drexler* asserted that:

> [t]he general answer may be given that a claim based upon an unstayed judgment as to which an appeal has been taken by the debtor is not the subject of a bona fide dispute. Once entered, an unstayed final judgment may be enforced in accordance with its terms and with applicable law or rules, even though an appeal is pending.... The filing of an involuntary petition is but one of many items by which a judgment creditor may seek to attempt collection of something upon its judgment.
>
> It would be contrary to the basic principal respecting, and would effect a radical alteration of, the long-standing enforceability of an unstayed final judgment to hold the pendency of the debtor's appeal created a "bona fide dispute" within the meaning of Code § 303.

*Id.* (citations omitted) (footnote omitted). The court further stated in a footnote that if the judgment had been stayed, the claimant would appear to be precluded from joining the involuntary petition or taking any other action to attempt collection on the judgment. *Id.* at 967 n. 11.

Similarly, in the case of *In re Raymark Industries, Inc.,* 99 B.R. 298, 300 (Bankr. E.D.Pa.1989), an involuntary bankruptcy petition was filed by four creditors who held judgments against debtor which arose out of asbestos-related personal injury litigation. The court first noted that some creditors possessed a stayed judgment. Accordingly, such claims were subject to a bona fide dispute and lacked standing to institute an involuntary petition. In contrast, those creditors which held unstayed judgments against the debtor had standing to file an involuntary petition.

Norris relied solely upon the case of *In re Prisuta,* 121 B.R. 474 (Bankr.W.D.Pa.1990).

---

17. *E.g., In re Raymark Industries, Inc.,* 99 B.R. 298, 300 (Bankr.E.D.Pa.1989) (unstayed judgment not subject to a bona fide dispute; stayed judgment would still be subject to bona fide dispute); *In re Drexler,* 56 B.R. 960 (Bankr. S.D.N.Y.1986) (claim based on an unstayed judgment pending appeal was not subject to a bona fide dispute); *In re Galaxy Boat Mfg. Co.,* 72 B.R. 200, 202 (Bankr.D.S.C.1986) (although the debtor appealed a default judgment entered in state court, the claim was not subject of a bona fide dispute); *In re Smith,* 123 B.R. 423, 424 (Bankr. M.D.Fla.1990), *aff'd,* 129 B.R. 262 (M.D.Fla. 1991) (since the bank was holder of state court judgment against the debtor, the debt was not subject to a bona fide dispute); *In re Schiliro,* 64 B.R. 422, 425 (Bankr.E.D.Pa.1986) (claim against debtor had been reduced to a confessed judgment and was not contingent or subject to a bona fide dispute). *See also Concrete Pumping Service, Inc. v. King Constr. Co.,* 943 F.2d 627, 629 (6th Cir.1991) (noting that contested involuntary petition did not involve a bona fide dispute as petitioner's claim had been reduced to judgment pre-petition); *In re Everett,* 178 B.R. 132, 140 (Bankr.N.D.Ohio 1994) (unappealed, unstayed final judgment not subject to a bona fide dispute); *In re Caucus Distributors, Inc.,* 83 B.R. 921, 928–29 (Bankr.E.D.Va.1988) (unstayed contempt fine not subject to a bona fide dispute).

In this case, the Prisutas guaranteed payments owed by Shanker Mechanical Corporation to the petitioning creditors. Mr. Prisuta was a principal and president of Shanker. Shanker filed a voluntary petition under Chapter 11 on August 11, 1989. In state court, judgment was confessed in favor of Bank One against the Prisutas on August 17, 1989. On April 6, 1990, a default judgment was entered in federal court against the Prisutas in favor of Century Surety Company and Alliance Indemnity Insurance Company. Another claim by National American Insurance Company had not been reduced to judgment. Since these judgments all remained unsatisfied, an involuntary petition was filed on August 8, 1990.

The court in *Prisuta* followed the objective test for determining whether a bona fide dispute existed. *Id.* at 475 (*citing B.D.W. Assocs. v. Busy Beaver Building Centers,* 865 F.2d 65, 66 (3d Cir.1989)). The court also recognized the leading case of *In re Drexler* and noted:

> [r]elatively few cases have dealt with whether a claim which arises out of a judgment is subject to a bona fide dispute. The few cases which have considered the matter have relied upon the general principal that such claims are *not* subject to a bona fide dispute. *See, e.g., In re Raymark Industries, Inc.,* 99 B.R. 298, 300–01 (Bankr.E.D.Pa.1989); *In re Caucus Distributors, Inc.,* 83 B.R. 921, 923 (Bankr. E.D.Va.1988); *In re Schiliro,* 64 B.R. 422, 425 (Bankr.E.D.Pa.1986).
>
> These cases offer little or no explanation for this general principal but instead rely on the leading case of *In re Drexler,* 56 B.R. 960, 967 (Bankr.S.D.N.Y.1986), which appears to be the only reported case to offer any rationale in support of the principal.

*In re Prisuta,* 121 B.R. at 476.

The *Prisuta* court fully acknowledged that *Drexler* was the prevailing case on the issue, and found no basis to disagree with its reasoning or rationale. However, the court distinguished *Drexler* and attempted to carve

out a specific exception because its application would be "inappropriate" to those particular facts. *Id.* at 477. The court noted that:

> [l]ike virtually every legal principal, the *Drexler* holding is not without exception. It is possible, where circumstances so dictate, for there to be a bona fide dispute when the claim arises from an unstayed, unappealed judgment of record. To hold otherwise would, in certain instances, enable creditors to use the threat of involuntary bankruptcy as a weapon to coerce a debtor to satisfy a judgment even when substantial questions may remain concerning the liability of the debtor.

*Id.* at 476.

This Court does not find *Prisuta* persuasive. The case seems to be an aberration in the law and very fact specific. In *Prisuta,* unlike *Drexler* and this matter, no evidentiary hearings were held prior to the rendition of the judgments. The claims arose from a default judgment and a confession of judgment. The *Prisuta* court seemed to have been apprehensive about recognition of these claims for involuntary bankruptcy purposes. Thus, *Prisuta* strained for a result favorable to the debtors. In this case, Norris' liability arose out of a state court judgment rendered after years of discovery and litigation. Although Norris was confident that the judgment will be reversed (and the petitioning creditors will owe him $300,000.00 and interest from 1989), this subjective opinion does not rise to the level of a bona fide dispute. Thus, *Prisuta* is easily distinguishable from the matter at hand, and Norris' reliance on such is misplaced.

### B. Substantive Grounds for Relief

 If the involuntary petition is contested, the Court, after finding the procedural requirements for relief have been met, must determine whether the substantive grounds are present. Under the Bankruptcy Act, involuntary relief was allowed if the debtor committed one of six "acts of bankruptcy" within four months of the petition date.[18]

---

18. Bankruptcy Act of 1898 § 3(a). Generally, such acts included fraudulent conveyances, preferences, avoidable judicial liens, etc. The ratio-

nale for this requirement was that the debtor should not be forced in bankruptcy simply because it was short of money. *See Cook v. Tullis,*

Proof of the commission of an act of bankruptcy frequently required a showing that the debtor was insolvent on a "balance sheet" when the act was committed.[19] These requirements were very technical and often difficult to prove. Further, commentators criticized these standards because the focus of an involuntary case should be the debtor's financial position rather than conduct. *See 2 Collier on Bankruptcy*, ¶ 303.12, p. 303–56 (1995). *See also* TREIMAN, ACTS OF BANKRUPTCY IN PERSPECTIVE, 67 Harv.L.Rev. 500, 503 (1954).

Under the Bankruptcy Code, these requirements were abolished and replaced with a more objective statutory grounds. 11 U.S.C. § 303(h) states the court will enter relief:

(h) [i]f the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute; or

(2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

■ This Court notes that the burden is on the petitioning creditors to establish that the debtor was generally not paying such debts as they become due as of the date of filing.[20]

### 1. "[G]enerally not paying such debtor's debts"

■ Subsection (h) provides that if the debtor does timely answer the petition, the Court shall order relief if the debtor is "generally not paying such debtor's debts as such debts become due." This test, which considers "equitable insolvency" rather than "balance sheet" insolvency was one of the most significant departures from the Bankruptcy Act.[21] However, Congress failed to provide the courts with much guidance as to the standard.[22] The word "generally" seemed to suggest that the bankruptcy court should properly consider both the number and amount of debts when determining whether the failure to pay is, in fact, "general." REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, Part II at 75 (1973).[23] Regardless, a definitive answer

85 U.S. (18 Wall.) 332, 340, 21 L.Ed. 933 (1873). Thus, bankruptcy relief was afforded only if general bankruptcy policies were somehow undermined.

**19.** Cases under the Bankruptcy Act of 1898 looked to the debtor's "inability" to pay under § 3(a)(6). *See also* Notes of Committee on the Judiciary, S.Rep. No. 95–989, 95th Cong., 2d Sess. 34 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

**20.** *E.g., Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1546 (10th Cir.1988); *Paroline v. Doling*, 116 B.R. 583, 585 (Bankr.S.D.Ohio 1990). *See also In re Petro Fill, Inc.*, 144 B.R. 26 (Bankr. W.D.Pa.1992); *In re Smith*, 123 B.R. 423 (Bankr. M.D.Fla.1990), *aff'd*, 129 B.R. 262 (M.D.Fla. 1991); *In re Molen Drilling Co.*, 68 B.R. 840 (Bankr.D.Mont.1987); *In re CLE Corp.*, 59 B.R. 579 (Bankr.N.D.Ga.1986).

**21.** Notes of Committee on the Judiciary, S.Rep. No. 95–989, 95th Cong., 2d Sess. 34 (1978); H.R.Rep. 95–595, 95th Cong., 1st Sess. 323–24

(1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 34 (1978). *See In re West Side Community Hospital, Inc.*, 112 B.R. 243, 256 (Bankr.N.D.Ill. 1990).

**22.** Section 303(h)(1) does not have a clear legislative interpretation because there was no conference committee report in 1978 and neither the House nor the Senate version was passed. The House version provided that the debtor was "generally unable to pay," while the Senate version had a two-tiered test of "generally unable to pay or has failed to pay a major portion thereof." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 324 (1977); S.2266, 95th Cong., (1978). 2 *Collier on Bankruptcy*, ¶ 303.12, p. 303–60 (1995).

**23.** The Report states in pertinent part that:
[t]he scope and meaning of generally unable and generally failed are left to the courts; it is not possible to lay down guidelines that will fit all cases. However, it is clear that the court must find more than prospective inability to pay only a few of the debtor's liabilities when

cannot be found in the Code and was ultimately left to the courts to fashion a definition. *See 2 Collier on Bankruptcy*, ¶ 303.12, p. 303–61 (1995) (*citing* Report of the Commission of the Bankruptcy Laws of the United States, 1973, Pr. II at 75, n. 5).

█ The 1984 Amendments were expected to clear up the uncertainty by analyzing only those debts in *bona fide* dispute. Nevertheless, application of the statutory standard remained difficult, and the case law continued to be uncertain. *See In re B.D. Int'l Discount Corp.*, 13 B.R. 635 (Bankr. S.D.N.Y.1981), *aff'd*, 701 F.2d 1071 (2d Cir. 1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). As a result, the courts have employed a flexible, case-by-case standard. Specifically, they often examine the totality of circumstances and balance the interests of the debtor with those of the creditors.[24] A pure mathematical test would not reveal whether a debtor was "generally" paying its debts as they become due. *E.g., In re Hill*, 5 B.R. 79, 83 (Bankr.D.Minn.1980) (court referred to the dictionary definition of "generally" and concluded that the failure to pay debts in a general manner, without regards to specific debts, is the statutory test).

In the case of *In re All Media Properties, Inc.*, 5 B.R. 126, 143 (Bankr.S.D.Tex.1980), *aff'd*, 646 F.2d 193 (5th Cir.1981), the court rejected the argument that "generally"

meant a majority of the time or that the dividing line was one of simple mathematics. Rather, the court employed a less restrictive test to allow enough leeway for bankruptcy courts to handle a variety of situations. *Id.* at 143. The court further stated that it:

> believes that generally not paying debts includes regularly missing a significant number of payments to creditors or missing payments which are significant in amount in relation to the size of the debtor's operation. Where the debtor has few creditors the number which will be significant will be fewer than where the debtor has a large number of creditors. Also, the amount of the debts not being paid is important. If the amounts of missed payments are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper.

*In re All Media Properties, Inc.*, 5 B.R. at 142.

█ More recently, common standards have evolved in many bankruptcy cases. These factors include: 1) the number of unpaid claims; 2) the amount of such claims; 3) the materiality of the nonpayments; and 4) the debtor's overall conduct in its financial affairs.[25] Furthermore, the number of creditors and amount of such debt should be determined at the date the petition was filed, or January 30, 1995. *E.g., Bartmann v.*

---

> they fall due and more than a past failure to pay only a few of his debts. It is intended that the court consider both number and amount in determining whether the inability or failure is general.
> Report of the Commission on the Bankruptcy Laws of the United States, 1973, Pt. II at 75.

**24.** *E.g., Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540 (10th Cir.1988); *Concrete Pumping Service, Inc. v. King Constr. Co.*, 943 F.2d 627 (6th Cir.1991); *In re Molen Drilling Co.*, 68 B.R. 840 (Bankr.D.Mont.1987); *In re CLE Corp.*, 59 B.R. 579 (Bankr.N.D.Ga.1986); *In re Einhorn*, 59 B.R. 179 (Bankr.E.D.N.Y.1986); *In re Win-Sum Sports, Inc.*, 14 B.R. 389 (Bankr.D.Conn. 1981). *See also In re B.D. Int'l Discount Corp.*, 13 B.R. 635 (Bankr.S.D.N.Y.1981), *aff'd*, 701 F.2d 1071 (2d Cir.1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983) (the Second Circuit declined to establish a standard and did not follow the *Covey* decision on how to treat disputed claims for determining whether a debtor was generally not paying under

§ 303(h)(1)); *Matter of 7H Land & Cattle Co.*, 6 B.R. 29 (Bankr.D.Nev.1980); *In re Luftek*, 6 B.R. 539 (Bankr.E.D.N.Y.1980).

**25.** *E.g., In re Ethanol Pacific, Inc.*, 166 B.R. 928, 931 (Bankr.D.Idaho 1994) (debtor liquidated assets and used all proceeds to make only partial payments, thus it was not considered generally paying its debts); *In re West Side Community Hospital, Inc.*, 112 B.R. 243 (Bankr.N.D.Ill. 1990); *In re Better Care, Ltd.*, 97 B.R. 405 (Bankr.N.D.Ill.1989); *In re Caucus Distributors, Inc.*, 106 B.R. 890 (Bankr.E.D.Va.1989); *In Re Ramm Indus., Inc.*, 83 B.R. 815, 824 (Bankr. M.D.Fla.1988); *In re Garland Coal & Mining Co.*, 67 B.R. 514 (Bankr.W.D.Ark.1986); *In re Dakota Lay'd Eggs*, 57 B.R. 648 (Bankr.D.N.D.1986); *In re Leek Corp.*, 52 B.R. 311 (Bankr.M.D.Fla.1985); *In re Reed*, 11 B.R. 755 (Bankr.S.D.W.Va.1981); *In re Tarletz*, 27 B.R. 787, 789 (Bankr.D.Colo. 1983); *In re Galanis*, 20 B.R. 590 (Bankr. D.Conn.1982); *In re Chong*, 16 B.R. 1 (Bankr. D.Haw.1980); *In re Luftek*, 6 B.R. 539 (Bankr. E.D.N.Y.1980).

*Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir.1988); *In re Garland Coal & Mining Co.*, 67 B.R. 514 (Bankr.W.D.Ark.1986).

 In this case, Norris has numerous *known* creditors including: 1) his mother; 2) cousin; 3) the Clerk of Court; 4) other recurrent creditors; 5) most probably the IRS; 6) Allan L. Placke; 7) Don H. Johnson; and 8) the law firm of Johnson & Placke. Specifically, Norris owes his mother over $340,-000.00 arising out of two demand notes executed by him in 1994. Norris testified that he made a payment of approximately $6,600.00 to his mother at one time. Nevertheless, he did not know when such payment was made or whether his mother applied it to principal and interest or solely to the latter. Norris testified that his mother assured him that he could pay the interest monthly, quarterly, yearly, or whenever he wished. Norris had clearly stipulated, however, that only interest had been paid. *Joint Pretrial Stipulation*, p. 3. Moreover, Norris had paid "nothing" on that debt for six months. *Id.*

In addition, Norris owes his cousin approximately $100,000.00 from two demand notes also executed in 1994. Norris testified that he had paid "nothing" on that debt either. Norris stipulated, however, that he had paid his cousin "only interest, but nothing for six months." *Joint Pretrial Stipulation*, p. 3. Furthermore, Norris owes money to the Clerk of Court for expert witness fees and court costs. Norris had also paid "nothing" on that debt as well. *Joint Pretrial Stipulation*, p. 3. Regarding the loan from Deposit Guaranty/Louisiana Bank which holds a mortgage on his residence, Norris conveniently prepaid twelve or thirteen monthly payments, or approximately $18,000.00, in October 1994. This was roughly at the same time judgment was rendered against Norris, but shortly before the involuntary petition was filed. Consequently, that debt would not become "due" until approximately October 1995. Norris explained that he made the lump sum payment because he was concerned about having a "cash flow problem."

Norris also has admitted numerous "ongoing recurring bills related to his law practice and household obligations." *Joint Pretrial Stipulation*, p. 3. Curiously, Norris did not utilize a checking account to pay these bills. Rather, he paid these and other creditors with a myriad of postal money orders. Exhibit P–12, *et al.* Norris testified that at the time of filing, he was current on these debts. A cursory review would tend to concur with Norris. However, a closer examination of Exhibits P–12(c), P–12(f), P–12(i), and P–12(p) indicates otherwise. Exhibit P–12(c), an invoice dated February 2, 1995, displays that Norris owed Executive Business Products $172.00. This debt had reached "delinquent status" and was thirty-one to sixty days delinquent. Norris paid this amount on April 6, 1995, by postal money order. Exhibit P–12(f), an invoice dated February 17, 1995, displays "late charges" for services rendered in November 1994. This invoice was over "90 days" past due. Services rendered in December 1994 were over "60 days" late. Once again, Norris paid the $24.64 balance on April 6, 1995, by postal money order. Exhibit P–12(i), an invoice dated February 21, 1995, shows a balance from the previous billing date of January 1, 1995. Norris paid the $110.00 bill on April 6, 1995, by postal money order. The Court notes that Norris wrote "[p]lease accept my apology on the delay."[26]

Other recurrent creditors were prepaid or overpaid by Norris. For instance, Norris admitted that he overpaid his light and utility bills, doctor bills, and other expenses. Again, Norris felt "uncertain" about a "cash flow problem." In October 1994, approximately the same month the state court judgment was entered, Norris prepaid six months rent to his landlord where his office space was located. Norris explained that the land-

---

**26.** At trial, Norris testified that he was current on his expenses and debts incurred by his law practice. However, Exhibit P–12(p) seemingly indicates that Norris was not current paying his professional liability insurance. The Court notes that there is no billing date on the statement, but it displays a due date of April 1, 1995. More-

over, it indicates that the premium was "past due" at the time of billing. Norris was given a "30 day grace period," but he did not pay the bill until April 26, 1995. Consequently, even though this debt may not have been "due" on the date of the filing, it generally suggests that Norris was untruthful in such an assertion.

lord insisted on an advance because of "all that stuff coming out in the paper."

Norris testified that his income from his practice was anywhere from $100,000.00 to $200,000.00 annually. However, Norris did not know his exact income for the 1994 tax year since his books were all "in a mess." He estimated his 1994 income at $100,000.00, but had not filed his tax return for that tax year. Moreover, he was also unsure when he filed his tax return for the 1993 tax year, and did not recall filing it at all. Norris asserted that his accountant told him that she "sent the return to him" and was supposedly "checking" on the matter with the IRS. Notwithstanding this uncertainty, in October 1994, Norris admitted paying the IRS $60,-000.00 for taxes owed. He also paid taxes due the State of Louisiana relatively at the same time. This was also approximately at the same time the state court decision was rendered.

Norris also admitted that his mother paid some of his legal fees owed to his bankruptcy counsel, Mr. Anderson. In addition, his mother paid Mr. Shael Herman and Mr. Max Nathan for their depositions.[27] His mother has also "let him have" some money for living expenses. Norris, however, was unable to recall the exact amount of such advances stating that it was approximately "$20,000.00 to $40,000.00." Very recently, Norris' mother "helped" him obtain legal counsel from New Orleans to assist on the appeal.

Norris also owes Allan L. Placke, Don H. Johnson, and the law firm of Johnson & Placke an aggregate total of $840,000.00 from executory judgments rendered against him in favor of these creditors. Norris admitted that he has paid absolutely "nothing" on these claims. *Joint Pretrial Stipulation*, p.

3. Admittedly, the largest portion of Norris' outstanding liabilities consist of debts to these petitioning creditors. Regardless, nonpayment of a few large debts has been held sufficient to warrant an order of relief. *E.g., In re Garland Coal & Mining Co.*, 67 B.R. at 522 (citations omitted). Thus, when the unpaid creditors are few in number but large in amount such as this case, relief has been granted. *Id. See, e.g., Hill v. Cargill, Inc.*, 8 B.R. 779 (D.Minn.1980); *In re Kreidler Import Corp.*, 4 B.R. 256 (Bankr.D.Md.1980).

For example, in the case of *Hill v. Cargill, Inc.*, 8 B.R. at 780, the debtors failed to pay three large debts resulting from guaranty obligations and judgments rendered against the debtor. The debts consisted of judgments of $32,000.00 and $106,205.00 and a guaranty obligation of $1.25 million. Although the debtor paid its small consumer creditors, the court ordered relief because of the overwhelming total amount of unpaid claims. Likewise, in the case of *Concrete Pumping Service, Inc. v. King Constr. Co.*, 943 F.2d 627 (6th Cir.1991), the debtor was not generally paying its debts as they become due where it was in default on 100% of its outstanding debt owed to only one creditor. Furthermore, in the case of *In re B.D. Int'l Discount Corp.*, 13 B.R. 635 (Bankr. S.D.N.Y.1981), *aff'd*, 701 F.2d 1071 (2d Cir. 1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983), evidence on the creditor's petition warranted finding that the debtor was generally not paying its debts. This debtor failed to pay one creditor whose claim constituted 98% of the debtor's outstanding liabilities. Further, the debtor failed to pay three other creditors as well.

The fact that Norris disputes the validity of a judgment[28] held by the petition-

---

**27.** Norris unsuccessfully sought to introduce these depositions at the hearing on the Motion to Dismiss and at the trial on the merits in support of his claim that the judgment was wrongfully decided.

**28.** If the petitioning creditors' judgment was reversed, Norris argued that he could make sufficient income from his law practice to pay his other debts, including the loans from his mother and his cousin "depending on how things go." He acknowledged, however, that his practice had substantially "dropped off" and he had been

"bombarded" with all of "this," presumably referring to the matter at hand. He also admitted that continuing his practice had been difficult since he was "hit by a new filing every time he turned around."

He later insisted that he could pay his mother and cousin, if necessary, from a sale of the collateral. Although he possessed no formal appraisals, he asserted such sales would pay these debts. This suggestion is completely at odds with Norris' testimony in this Court on April 5, 1995, where he became very distraught on the stand while discussing property which had been in his

ing creditors does not automatically disqualify them from asserting the general nonpayment of the debts under 11 U.S.C. § 303(h). *E.g., In re Albers,* 71 B.R. 39, 43 (Bankr. N.D.Ohio 1987). The *Albers* court relied on *In re All Media Properties, Inc.,* 5 B.R. 126, 142 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981), which stated:

> [t]he Congressional intent is rather clearly to qualify as a petitioning creditor any party holding a non-contingent claim, leaving to later or other proceeding the issue of substantial disputes as to liability. Congress has indicated that the primary issue in an involuntary proceeding is and should be whether the debtor is generally not paying his debts as they become due and that this issue may properly be placed before the court even though the creditor seeking relief is the holder of a disputed claim. It therefore must follow that the trial of an involuntary petition is not the place to resolve complex disputes as to the validity of the claim.

*Id.* at 43 (*citing In re All Media Properties, Inc.,* 5 B.R. at 135). Moreover, the court asserted that this policy should apply "with even greater force when, as in this case, the claims are final judgments." *Id.* at 43.

In this matter, this Court has come to the unescapable conclusion that Norris was not paying his debts as they became due at the time the involuntary petition was filed. Norris was in total default on his obligations to the three petitioning creditors. He has also failed to pay his mother, his cousin, the Clerk of Court, numerous other recurrent creditors, and most likely the IRS. His stealthy handling of his financial affairs is nothing more than a facade to create the artificial "illusion" of a debtor paying his debts. Norris' own actions have converted his once debt-free portfolio into a mountain of debt, thus leaving these creditors no other alternative but to turn to the this Court.

### C. Norris' Defenses of a Two–Party Dispute, Abstention/Suspension, and a Bond

█ Norris argued that this matter was nothing more than a two-party dispute, thus the case should be dismissed. Admittedly, the courts have developed almost a *per se* rule against granting a petition for involuntary bankruptcy where there is only a single unpaid debt.[29] Courts have condemned and ultimately dismissed involuntary cases where a single petitioning creditor attempted to use the bankruptcy court as an alternative to state court litigation, where the creditor had adequate state law remedies, or where the debtor had no significant assets for the bankruptcy court to administer.[30] However, this

---

family for a number of years. This is the same property on which Norris granted a multitude of mortgages to his relatives. In contrast, the suggestion that a sale of the property would satisfy the mortgage creditors was delivered in a calm and unemotional manner at trial.

Norris also maintained he would have sufficient income to make an annual payment of $40,000.00 on these loans after paying his living expenses. He calculated the interest payments on the notes to his mother at "eleven something [or] thirteen thousand annually." Questioned if the payments on the principal would require approximately $48,000.00 a year, he testified that at times, he had that much money "left over" after meeting his living expenses, but his family's standard of living had to change.

29. *E.g., In re Nordbrock,* 772 F.2d 397 (8th Cir. 1985); *In re Smith,* 123 B.R. 423 (Bankr. M.D.Fla.1990), *aff'd,* 129 B.R. 262 (M.D.Fla. 1991); *In re Axl Industries, Inc.,* 127 B.R. 482, 484 (S.D.Fla.1991), *aff'd without op., in part, dismissed without op., in part, Remex Electronics v. Axl Industries, Inc.,* 977 F.2d 598 (11th Cir. 1992); *Paroline v. Doling,* 116 B.R. 583 (Bankr.

S.D.Ohio 1990); *In re H.I.J.R. Properties, Denver,* 115 B.R. 275 (D.Colo.1990); *In re Gold Bond Corp.,* 98 B.R. 128 (Bankr.D.R.I.1989); *In re Fales,* 73 B.R. 44 (Bankr.S.D.Ohio 1987) (fraud in securing mortgages for purpose of defeating creditor's collection efforts amounted to special circumstances, but the case was ultimately dismissed where state court could serve interest of creditor); *In re Blaine Richards & Co.,* 16 B.R. 362, 365 (Bankr.E.D.N.Y.1982) ("ordinarily there can be no order for relief based upon the mere failure to pay a single creditor ..."); *In re R.V. Seating, Inc.,* 8 B.R. 663 (Bankr.S.D.Fla. 1981) (dismissed where assets in the form of accounts receivable could be garnished by judgment creditor); *Matter of 7H Land & Cattle Co.,* 6 B.R. 29, 31 (Bankr.D.Nev.1980). *See also* 2 *Collier on Bankruptcy,* ¶ 303.01, p. 303–20 (15th ed. 1995).

30. *E.g., In re Nordbrock,* 772 F.2d 397 (8th Cir. 1985) (a creditor does not have a special need for bankruptcy relief if it can go to state court and collect a debt); *Paroline v. Doling,* 116 B.R. 583 (Bankr.S.D.Ohio 1990); *In re Arker,* 6 B.R. 632

Court disagrees with Norris and his reliance on such theory is misplaced. This Court has already determined that Norris has unquestionably failed to pay more than one debt.

■ Moreover, there are two well recognized exceptions to the general rule. Courts have granted involuntary relief where only a single creditor is not being paid when it is demonstrated that: 1) special circumstances amounting to trick, fraud, artifice or scam were used to isolate the creditor, or that 2) the creditor cannot possibly obtain adequate relief outside the bankruptcy setting. This rule was developed in the case of *Matter of 7H Land & Cattle Co.*, 6 B.R. 29, 31 (Bankr. D.Nev.1980), and has been followed by numerous cases.[31] Accordingly, this Court does not read 11 U.S.C. § 303(h)(1) to prohibit all single creditor involuntary cases, especially where one of the above-mentioned exceptions apply.

Special circumstances existed in the case of *Concrete Pumping Service, Inc. v. King Constr. Co.*, 943 F.2d 627 (6th Cir.1991), where the facts strongly suggested that an insider of the debtor engaged in fraud, artifice, scam, or possibly all three. After the debtor lost a judgment to the creditor, the insider executed security agreements encumbering almost all of the debtor's assets, collected on the security agreement, and then quickly opened another business similar to that of the debtor. Likewise, a two party dispute was allowed in the case of *In re B.D. Int'l Discount Corporation*, 13 B.R. 635 (Bankr.S.D.N.Y.1981), *aff'd*, 701 F.2d 1071 (2d Cir.1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). Funds were suspiciously shifted between related corporate entities and were later transferred out of the country in order to take advantage

of a multi-million dollar bank credit mistakenly granted. Moreover, the debtor had defaulted on a debt which represented 98% of its total liabilities. The court stated that the case was ripe for appointment of a trustee and deserved bankruptcy administration even if there was only one creditor.

■ In this case, there could scarcely be any more strange, irrational, exceptional, and indeed bizarre circumstances than the ones at hand. The central factual dispute distills to whether Norris incinerated, as he maintained, approximately $500,000.00 in United States currency. The alleged conflagration occurred on or about October 1, 1994, immediately after Norris learned of the adverse decision by the state trial court. Norris most likely expected the state court judgment to be rendered against him. He was an experienced trial attorney and presumably had some impression of how the trial transpired. In response to those proceedings, Norris consequently borrowed over $500,000.00 with interest before the judgment was rendered. In return, Norris suspiciously granted his mother, cousin, and a commercial lender numerous mortgages on his portfolio of unencumbered property. Hence, he left few, if any, assets available for execution should the judgment be adverse.

Contemporaneously, Norris also expended thousands of dollars prepaying and overpaying numerous creditors. He purchased a Mercedes–Benz, remodeled his home, and withdrew approximately $5,000.00 to $10,-000.00 with absolutely no explanation of where the money was spent. After the judgment was entered, Norris borrowed $80,-000.00 more from his mother and cousin. His mother let him "have" $20,000.00 to $40,-

(Bankr.E.D.N.Y.1980); *In re Westerleigh Dev. Corp.*, 141 B.R. 38 (Bankr.S.D.N.Y.1992); *In re Axl Industries, Inc.*, 127 B.R. 482 (S.D.Fla.1991), *aff'd in part, dismissed in part sub nom., Remex Elecs. v. Axl Industries, Inc.*, 977 F.2d 598 (11th Cir.1992); *In re Kass*, 114 B.R. 308 (Bankr. S.D.Fla.1990). *See also* 2 *Collier on Bankruptcy*, ¶ 303.07, p. 303–20 (15th ed. 1995).

31. *E.g., Concrete Pumping Service, Inc. v. King Constr. Co.*, 943 F.2d 627 (6th Cir.1991); *In re Nordbrock*, 772 F.2d 397 (8th Cir.1985); *Paroline v. Doling*, 116 B.R. 583 (Bankr.S.D.Ohio 1990);

*In re Gold Bond Corp.*, 98 B.R. 128 (Bankr.D.R.I. 1989); *In re H.I.J.R. Properties Denver*, 115 B.R. 275 (D.Colo.1990); *In re Axl Industries, Inc.*, 127 B.R. 482, 484 (S.D.Fla.1991), *aff'd without op., in part, dismissed without op., in part, Remex Electronics v. Axl Industries, Inc.*, 977 F.2d 598 (11th Cir.1992); *In re B.D. Int'l Discount Corp.*, 13 B.R. 635 (Bankr.S.D.N.Y.1981), *aff'd*, 701 F.2d 1071 (2d Cir.1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); *In re Blaine Richards & Co., Inc.*, 16 B.R. 362 (Bankr. E.D.N.Y.1982); *In re Arker*, 6 B.R. 632 (Bankr. E.D.N.Y.1980).

000.00 more to "live on," according to Norris. He also continued to prepay and overpay other creditors. In explanation, Norris stated that he raised the money and converted it to currency for a possible appeal bond. This Court is perplexed that an experienced attorney would believe actual currency would be required by an insurer. If, in fact, Norris believed actual currency was required, why would he incinerate the money as he alleged without attempting to post a bond?

While questioned about the events preceding and subsequent to the alleged fire, Norris rambled and hesitated in his cryptic responses. Norris did not have the vaguest recall of the actual date on which the fire supposedly occurred. In fact, he was totally oblivious as to whether it occurred on Saturday or Sunday, the time of day, or his other activities and whereabouts during that weekend. Further, he failed to recall the whereabouts of his family on the momentous date. Indeed, except for the alleged fire itself, he had absolutely no recall of *any* other event or activity in connection with the proverbial "lost weekend." Also, Norris' recollection of virtually everything in his life during the months and years prior to that weekend was abysmal.

In addition, Norris could not remember other pertinent information regarding his personal or business affairs. Specifically, he failed to explain any of the expenditures from the $5,000.00 to $10,000.00 he withdrew from the safe-deposit box. He possessed no documentation, nor had he produced any for the Court or his creditors. When questioned, Norris failed to remember whether he filed his income tax return for 1993, how he determined the amounts to pay on his 1994 estimate, any approximate figures for his 1994 income, or any other relevant details about his personal income taxes. Norris' demeanor was evasive and his responses vague when questioned about germane facts other than the alleged immolation. Since that time, his memory has scarcely improved. It seems that the only occurrences Norris recalled since the non-event was his act of carrying coals from his barbecue smoker to the trash barrels and melting the bucket he used to burn the funds.

In contrast, while questioned about the events of the fire itself, Norris described it in a surreal manner, embellishing the tale with each telling. He remained composed and recalled the ephemeral incident in infinite detail. Norris' demeanor while he meticulously described these events suggests that he had repeated and rehearsed this version to a point where he himself believed the story. In essence, the lie has become the truth in Norris' own imaginative mind. Claiming to burn more money than most of the world will ever see in a lifetime, it is absurd to believe that Norris' foremost concern was for his lawn when it unexpectedly ignited. He supposedly exposed himself, his family, and his beloved family residence to immense danger by pouring gasoline near the vicinity of open flames. Remarkably, Norris did not burn either himself or the paper sack in the blaze. If his family had returned during this figment of Norris' extraordinary imagination, all might have perished while he excused himself to use the restroom.

Norris' earlier assertion that the funds were "spent," is of course, totally antithetical with his novel explanation that they were destroyed. Norris' reliance on lexicography for this usage strains credulity to the utmost. He carefully researched the definition in not one, but two dictionaries before his second deposition and this trial. However, when questioned about his concerns of criminal exposure and immunity, Norris apparently failed to review the Louisiana Criminal Code, a legislative enactment that he was elected by the public to enforce, and an area of speciality in his practice.

Curiously, there were no witnesses to the so-called fire which would seem to be atypical conduct in an area that prohibited the burning of trash and other refuse. Later, the foliage around the barrels, important evidence of the blaze, suspiciously disappeared in a frenzy of horticultural zeal which Norris developed just prior to the scheduled trial. As a result, evidence of the alleged fire was no longer available for inspection by the experts or the Court. Norris also conveniently discarded the plastic bucket that was supposedly used to soak and carry the currency to

the barrels. Norris' deliberate removal of all evidence of the professed fire speaks loudly about his veracity.

By Norris' own account, he spent a great deal of time at his new found gardening interest. This, despite the fact that he was, by his own admission, struggling to reestablish his law practice, besieged with filings and threats of contempt from the state court, attempting to obtain immunity from both the federal and state governments, fearing prosecution from his own wife, and engaging in myriad of complex commercial transactions to borrow from relatives in order to meet his everyday living expenses. In fact, Norris seemed to be a very busy man, scarcely having the time to satisfy his new "green thumb" by puttering in his yard.

The CH & A, Inc., report and that of Norris' witness, Mr. Johnson, are not irreconcilable, nor does this Court need to reconcile them to conclude that Norris' version is an absolute fabrication. From the testimony of his own witness, Norris overestimated the amount of fuel, the height of the flames, and the period of time required for his deed to be accomplished. Mr. Johnson opined that any fire in the incident barrel was caused by less fuel and was of less staggering dimensions than Norris described. Mr. Johnson also excluded the possibility that another significant fire took place in the non-incident barrel described by Norris as originating from hot coals from his barbecue. Also, the supposed damage to the ligustrum might have occurred as late as December 1994, according to Mr. Coker.

Consequently, this Court unquestionably concludes that Norris fabricated this all-encompassing and indeed phenomenal story. An uncorroborated tale which reeks of trick, fraud, artifice, and scam which was apparently contrived to deprive the petitioning creditors of the fruits of their judgment.

In addition, this Court determines that the petitioning creditors do not have adequate remedies under state law and were compelled to utilize the broad-reaching benefits of the Bankruptcy Code. These creditors have been unable to locate any unencumbered assets which could be administered and liquidated for their benefit. Obviously,

an important remedy of the petitioning creditors will be the attempted avoidance of the mortgages granted to Norris' mother and his cousin pursuant to the avoidance provisions in the Code. There may also be preference claims. The petitioning creditors assert that there is no applicable Louisiana statute to accomplish this task or remedy their damages. Specifically, they maintain that the revocatory action pursuant to LA.CIVIL CODE art. 2036, would be inappropriate because it is available only where the transfer "causes or increases the obligor's insolvency." Since Norris' mother and cousin actually delivered cash to him in exchange for the mortgages, his balance sheet did not change by virtue of these transactions. Norris asserted ambiguously that the "petitioners have adequate remedies under nonbankruptcy law to protect their rights," but failed to mention what those remedies may be. *Pretrial Brief,* May 10, 1995, p. 10. Accordingly, these creditors cannot possibly obtain adequate relief outside the Bankruptcy Court.

■ Lastly, nothing in these facts merits abstention or suspension of these proceedings pending the outcome of the appeal. Norris correctly asserted that the bankruptcy court has "broad latitude and discretion ... in deciding whether to abstain. The legislative history of the bankruptcy court supports the thesis of abstention where a few hostile creditors threaten involuntary bankruptcy to extract payment from a debtor." *Motion to Dismiss and/or Abstain With Incorporated Memorandum,* Feb. 22, 1995, p. 4. However, even if the judgments are reversed or modified, the likelihood that Norris could restructure his financial affairs is extremely doubtful. His affairs are in a state of complete chaos created by his own hand and resourceful mind. Consequently, there is no merit in Norris' Motion to Abstain and/or Suspend. Further, the Court is not persuaded by Norris' request for a bond pursuant to 11 U.S.C. § 303(e).

### III. TRUSTEE'S MOTION FOR TURNOVER

■ A number of prerequisites must be satisfied before turnover can be ordered pur-

suant to 11 U.S.C. § 542(a). That section provides:

[e]xcept as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

 First, the Court can order the turnover of property in possession of "entities." 11 U.S.C. § 101(15) defines entity as any "person, estate, trust, governmental unit, or United States trustee." Second, the property must be property of the estate as defined in 11 U.S.C. § 541. "Property" is not defined in the Bankruptcy Code. However, 11 U.S.C. § 541 generally describes property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case," wherever located and by whomever held. This definition has been broadly interpreted to include every conceivable interest of the debtor in the estate. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203–204, 103 S.Ct. 2309, 2312–13, 76 L.Ed.2d 515 (1983). Lastly, the property must be of a type that the debtor can exempt or the trustee can use, sell, or lease.

As stated, the Court concludes that Norris concocted this entire outlandish tale in an attempt to conceal whatever disposition, if any, he made of the funds. In fact, this Court believes Norris is still in possession and control of $490,000.00 to $500,000.00. This money is certainly property of the estate which could benefit Norris' creditors. Thus, the Court directs him to turnover the currency to the Trustee immediately pursuant to 11 U.S.C. § 542.

### CONCLUSION

From the forgoing reasons, this Court finds and concludes that: 1) the procedural and substantive requirements for sustaining an involuntary petition have been satisfied, thus the Court will enter an Order for Relief against Norris; 2) Norris' requests that the Court Abstain/Suspend or the petitioning creditors post a bond are hereby denied; and 3) the Trustee's Motion for Turnover pursuant to 11 U.S.C. § 542 is hereby granted.

Separate conforming orders will be entered.