**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 96-30146**
_____

**In The Matter Of: JAMES A. NORRIS, JR.,**

**Debtor.**

**JAMES A. NORRIS, JR.,**

**Appellant,**

**versus**

**DON H. JOHNSON; ALLAN L. PLACKE; BILLY R. VINING,**

**Appellees.**

_____

**Appeal from the United States District Court**
**for the Western District of Louisiana**
**(95-CV-1774, 95-CV-1791, 95-CV-1792, 95-CV-1857)**
_____
**April 11, 1997**

Before HIGGINBOTHAM, DAVIS, and BARKSDALE, Circuit Judges.

PER CURIAM:[1]

This is a most unusual case, to say the least, arising in part out of the claimed destruction by James A. Norris, Jr., debtor in an involuntary bankruptcy proceeding under Chapter 7, of approximately $500,000 in currency. He appeals the order for relief; an order requiring him to turnover the currency he claims

---

[1]      Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

he destroyed; an order denying his motion for stay and for appointment of expert witnesses; and an order holding him in civil contempt for failing to comply with the turnover order. It appears, however, that Norris was released recently from incarceration. We **AFFIRM**.

## I.

Norris formerly served as District Attorney for Ouachita and Morehouse Parishes in Louisiana and was a member of the law firm of Norris, Johnson & Placke. *In re Norris*, 183 B.R. 437, 440 (Bankr. W.D. La. 1995). In mid-June 1989, believing that his partners were using partnership funds for personal purposes, and without prior notification to them, Norris withdrew from the firm and, using approximately $526,000 of the partnership's funds on deposit in various accounts at banks in Ouachita Parish, paid off loans to the partnership, extinguishing all of its long-term debt, and paid to himself one-third of the remaining funds. He also paid himself $10,000 for law books that he had brought into the partnership. Shortly thereafter, Johnson, Placke, and the law firm filed suit against Norris in state court, seeking an accounting, restoration of funds paid on partnership debts, and damages. *Id*. at 440.

In January 1994, Norris and his wife borrowed approximately $150,000 from a commercial lender and mortgaged their home, which previously had been unencumbered. *Id*. at 441. And, during that January and February, Norris mortgaged other property to secure

loans of $300,000 from his mother and $60,000 from his cousin. *Id*. According to Norris, the purpose of the loans was for renovation of his home and to have funds available to post a cash bond if the state court action was decided adversely. *Id.* at 442. Norris deposited the loan proceeds into a bank account but later withdrew them, converted them into currency ($100 bills), and placed them in a safe deposit box. *Id*. Norris maintained that he spent $5,000 to $10,000 of the money on living expenses. *Id*.

Following a trial, the state court entered judgment against Norris in September 1994 for approximately $526,000, plus interest, less a credit of approximately $144,000, representing Norris' interest in the firm. In addition, the state court awarded the firm approximately $58,000, awarded $30,000 each to Johnson and Placke, and assessed Norris for costs and expert witness fees. Norris filed a devolutive appeal, but did not suspensively appeal the judgment; accordingly, it became final for purposes of execution. *Id*. at 440.

After the state court judgment was rendered, Norris prepaid 12 or 13 monthly payments on his home mortgage (approximately $18,000), with the next payment not due until approximately a year later -- October 1995. *Id*. at 444. Also in October 1994, Norris borrowed another $40,000 from his mother and another $40,000 from his cousin, and paid $60,000 to the Internal Revenue Service, as well as taxes owed to the State of Louisiana. *Id.* He also

- 3 -

purchased an automobile for his wife to replace her damaged vehicle, and had extensive renovations performed on his residence. *Id*.

At a state court judgment debtor examination in December 1994, when asked about the currency in the safe deposit box, Norris testified that he had "spent" it. And, when asked what the cash was spent on, he testified that he could "[g]o back and look at records" and provide more detail on "exactly what I've done with what monies". *Id*.

In January 1995, Johnson, Placke and the law firm initiated involuntary bankruptcy proceedings against Norris. That April, the trustee filed a motion for turnover of the $490,000 to $500,000 in currency formerly in the safe deposit box.

At a deposition that May, Norris testified that he used the term "spent" at the December 1994 judgment debtor examination to convey that the money was "gone", "burned". *Id*. According to Norris, after learning of the state court judgment, he went to the bank and removed the currency from the safe deposit box, placed it in his briefcase, and took it home; later that weekend, he saturated the currency with gasoline and burned it in a trash barrel outside his home. *Id*. at 442-43.

Following a trial in May 1995 on the involuntary petition and the turnover motion, the bankruptcy court entered an order for relief and granted the motion. *In re Norris*, 183 B.R. at 437. And

that June, the trustee moved for sanctions and to hold Norris in civil contempt for failing to comply with the turnover order. A week before the scheduled 21 July hearing, Norris sought a stay of all proceedings until the state court litigation appeals were exhausted. *In re Norris*, 192 B.R. 863, 866 (Bankr. W.D. La. 1995). And, prior to the taking of evidence at the hearing, Norris filed another motion, seeking a jury trial; appointment of counsel; appointment of experts to analyze the barrel in which the currency allegedly was burned; to dismiss the contempt proceedings as violative of his grant of immunity, for failure to comply with F.R.B.P. 9020, and because of a conflict of interest on the part of the trustee; and a continuance for lack of sufficient time to prepare. *Id*.

On 21 July, the bankruptcy court conducted a hearing on the contempt motion and Norris' motions; Norris appeared without counsel. The bankruptcy court entered an order denying Norris' motion for stay and for appointment of experts. *Id.* at 876. The portion of the order dealing with the trustee's contempt motion and Norris' motion for a jury trial, for appointment of counsel, and for dismissal was styled as a report and recommendation to the district court. *Id*. Norris objected to the report and recommendation, and appealed the order concerning relief and turnover. The district court affirmed the bankruptcy court's

relief and turnover orders and accepted its recommendation regarding contempt and the denial of other relief sought by Norris.

Following oral argument in this court, and by order dated 19 March 1997, the district court ordered that Norris be released immediately, based upon the United States deciding to pursue criminal proceedings against him.  The order provided that the release was so that Norris "can assist his counsel in the criminal charges against him."

## II.

Norris challenges the entry of the order for relief on grounds that the debts owed to the petitioning creditors were subject to a bona fide dispute, and that the petitioning creditors failed to prove that he was not generally paying his debts as they became due.  He contests the turnover order, claiming that the bankruptcy court finding that he did not burn the currency is clearly erroneous.  Finally, he challenges the contempt order on numerous grounds, including denial of counsel, of expert witness fees, and of a jury trial; the bankruptcy court's lack of contempt power; failure to comply with the notice requirements of F.R.B.P. 9020; and an alleged conflict of interest on the part of the trustee.

## A.

Involuntary bankruptcy proceedings are governed by 11 U.S.C. § 303.  If the debtor has 12 or more creditors, the petition must be filed by

three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $10,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

11 U.S.C. § 303(b)(1). If the debtor has fewer than 12 creditors, excluding employees, insiders, and transferees of voidable transfers, the petition may be brought by "one or more of such holders that hold in the aggregate at least $10,000 of such claims". 11 U.S.C. § 303(b)(2).

If the petition for involuntary relief is contested, the Bankruptcy Code provides, in pertinent part, that the bankruptcy court

shall order relief against the debtor ... only if

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute ....

11 U.S.C. § 303(h)(1).

We review the bankruptcy court's findings of fact under the clearly erroneous standard, and its conclusions of law *de novo*. F.R.B.P. 8013; *Subway Equip. Leasing Corp. v. Sims (Matter of Sims)*, 994 F.2d 210, 217 (5th Cir. 1993), *cert. denied*, 510 U.S. 1049 (1994).

1.

The bankruptcy court required the petitioning creditors to satisfy the requirements of § 303 (debtor generally not paying debts as they become due and debts not subject to bona fide dispute) by a preponderance of the evidence. *In re Norris*, 183 B.R. at 449. Citing *Grogan v. Garner*, 498 U.S. 279 (1991), Norris contends that the clear and convincing standard should have been used.

In *Grogan*, the Court stated that, "[b]ecause the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake." *Id*. at 286 (internal quotation marks and citations omitted). The Court concluded that the preponderance of the evidence standard applied to proof of 11 U.S.C. § 523's discharge exceptions (including the fraud exception), stating that it was unpersuaded that a debtor had an interest in discharge sufficient to require a heightened standard of proof or that the clear and convincing standard was necessary to effectuate the "fresh start" policy of the Bankruptcy Code. *Id*.

Although it is true that involuntary bankruptcy has been described as an "extreme" remedy, *e.g.*, *In re Cates*, 62 B.R. 179, 180 (Bankr. S.D. Tex. 1986), we do not consider the severity of the remedy to warrant the imposition of a clear and convincing standard

of proof for satisfaction of the requirements of § 303. A debtor may recover costs, attorney's fees, and damages against petitioning creditors if an involuntary case is dismissed and the petition was filed in bad faith, *see* 11 U.S.C. § 303(i). Accordingly, there is no need to create an exception to the general preponderance standard.

2.

Norris stipulated that each of the petitioning creditors held a claim of at least $5,000 more than the value of any lien on property of the debtor securing such claim, thus satisfying § 303(b)(1)'s requirement that the aggregate unsecured claims of the petitioning creditors exceed $10,000. *In re Norris*, 183 B.R. at 450. And, he does not challenge the bankruptcy court's ruling that the creditors' claims were not contingent as to liability, as required by § 303(b)(1). *Id*. at 451. He contends, however, that the debts of the petitioning creditors were subject to bona fide disputes, which disqualified them as petitioning creditors pursuant to § 303(b)(1), and precluded their debts from being considered in determining whether he was generally not paying his debts as they became due, pursuant to § 303(h)(1). Norris maintains also that the bankruptcy court erred by excluding expert testimony regarding the existence of a bona fide dispute and by holding that a debt based on an executory judgment is not subject to a bona fide dispute.

- 9 -

a.

Norris contends that, even though his debts to the petitioning creditors were based on a judgment entered by the state trial court, those debts were subject to bona fide disputes. In **Matter of Sims**, our court adopted an objective standard for making this determination. "Under that objective standard, the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." 994 F.2d at 220 (quoting **In re Rimell**, 946 F.2d 1363, 1365 (8th Cir. 1991), *cert. denied*, 504 U.S. 941 (1992)). We also adopted the Eighth Circuit's methodology for applying the standard:

> The petitioning creditor must establish a prima facie case that no bona fide dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a bona fide dispute does exist. Because the standard is objective, neither the debtor's subjective intent nor his subjective belief is sufficient to meet this burden. The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute. This does not mean that the bankruptcy court is totally prohibited from addressing the legal merits of the alleged dispute; indeed, the bankruptcy court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists. Finally, because the determination as to whether a dispute is bona fide will often depend ... upon an assessment of witnesses' credibilities and other factual considerations, the bankruptcy court's determination in this regard is a factual finding that may be overturned on appeal only if it is clearly erroneous.

- 10 -

*Id.* (brackets omitted; quoting *Rimell*, 946 F.2d at 1365).

The bankruptcy court reviewed the cases dealing with claims based on final judgments, and decided to join the overwhelming majority of other courts that have found that such claims are not subject to a bona fide dispute. *In re Norris*, 183 B.R. at 453-54. *See, e.g.*, *In re Everett*, 178 B.R. 132, 140 (Bankr. N.D. Ohio 1994) (unappealed, unstayed final judgments not subject to bona fide dispute); *In re Smith*, 123 B.R. 423, 425 (Bankr. M.D. Fla. 1990) (claim based on judgment not subject of bona fide dispute), *aff'd*, 129 B.R. 262 (M.D. Fla. 1991); *In re Raymark Industries, Inc.*, 99 B.R. 298, 300 (Bankr. E.D. Pa. 1989) (unstayed judgment not subject to bona fide dispute); *In re Drexler*, 56 B.R. 960, 967 (Bankr. S.D.N.Y. 1986) (claim based upon unstayed judgment as to which an appeal has been taken by debtor is not the subject of a bona fide dispute).

Norris relies on *In re Prisuta*, 121 B.R. 474 (Bankr. W.D. Pa. 1990). Although the *Prisuta* court recognized that *In re Drexler* was the leading case on the issue, it distinguished *Drexler* and created an exception because, "[t]o hold otherwise would, in certain instances, enable creditors to use the threat of involuntary bankruptcy as a weapon to coerce a debtor to satisfy a judgment even when substantial questions may remain concerning the liability of the debtor." *Prisuta*, 121 B.R at 476. But, in *Prisuta*, the claims were based on a default judgment and a

- 11 -

confession of judgment; and, unlike here, no evidentiary hearings were held prior to entry of the judgments. *Id*. at 475, 476.

In sum, we hold that the unstayed final judgment against Norris was not subject to a bona fide dispute for purposes of 11 U.S.C. § 303(b)(1) and 303(h)(1). To hold otherwise would require the bankruptcy court to review the state court judgment in order to predict Norris' chance of success on appeal (which would be particularly troubling in that a state court judgment is at issue), and would undermine the objective standard adopted in *Sims*. (We note that, although the existence of a bona fide dispute must be determined as of the date the petition was filed, *cf*. *Matter of Sims*, 994 F.2d at 222 (determination of whether debtor generally not paying debts as they become due must be made as of date of filing of petition), the state court judgment against Norris was affirmed by the Louisiana Court of Appeal, and the Louisiana Supreme Court denied Norris' writ application. *Johnson & Placke v. Norris*, 666 So. 2d 1098 (La. 1996).)

### b.

Norris contends that the bankruptcy court erred by refusing to admit into evidence the depositions of two expert witnesses who opined that the state court judgment would be reversed or substantially modified on appeal because of errors of law. Because the bankruptcy court was not required to predict Norris' chance of success on appeal, expert testimony on that subject was irrelevant.

- 12 -

Norris maintains that the bankruptcy court erred by holding that he was not generally paying his debts as they became due. In support, he asserted that the only unpaid debts as of the involuntary petition filing were those of the petitioning creditors, which he claims erroneously were subject to a bona fide dispute. Restated, the petitioning creditors' debts can be considered under § 303(h)(1) in making the "generally not paying" determination.

The Bankruptcy Code does not define the term "generally not paying", thus leaving the scope and meaning of that term to the courts. *See* 2 COLLIER ON BANKRUPTCY ¶ 303.14[1][b], at 303-78 (15th ed. rev. 1996). The determination of whether a debtor is generally paying his debts must be made as of the date the petition is filed. ***Matter of Sims***, 994 F.2d at 222. Accordingly, post-petition payments of debts that were due as of the filing date may not be considered; nor do we consider debts which have not then become due.

In ***In re All Media Properties, Inc.***, 5 B.R. 126 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981), one of the first cases to interpret the Code's provisions for involuntary proceedings, the bankruptcy court stated that the court should consider "both the amount of the debt not being paid and the number of creditors not being paid" in determining whether a debtor's

failure to pay is "general". 5 B.R. at 142. The court stated further that

> generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount in relation to the size of the debtor's operation. Where the debtor has few creditors the number which will be significant will be fewer than where the debtor has a large number of creditors. Also, the amount of the debts not being paid is important. If the amounts of missed payments are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper.

5 B.R. at 143.

COLLIER ON BANKRUPTCY describes the "generally not paying" standard as calling for "a broad definition rather than a mechanical test." 2 COLLIER ON BANKRUPTCY, ¶ 303.14[1], at 303-78 (15th ed. rev. 1996). Numerous factors have been considered by courts in determining whether a debtor is paying his debts as they become due, including: whether the debtor is conducting his financial affairs in a manner inconsistent with good faith and outside the ordinary course of business; the debtor's overall payment activity and payment practices; the amount of the debtor's debts compared to the amount of the debtor's yearly income; and the fact that insiders deferred payment on account of loans payable to them. *See* 2 COLLIER ON BANKRUPTCY ¶ 303.14[1][b], at 303-80, 303-81 (15th ed. rev. 1996), and cases cited therein.

At the trial on the involuntary petition, Norris testified that his only significant creditors as of the filing date were (1) the petitioning creditors; (2) his mother; (3) his cousin; and (4) the mortgage company. Pursuant to a joint pretrial stipulation, Norris had ongoing recurring bills related to his law practice and household obligations.

Norris testified that, on the filing date, he had not repaid any principal to his cousin, and that he had paid his mother $6,600, but was unsure whether she applied it to principal or interest. He had previously stipulated, however, that he had paid only interest on the claims of his mother and his cousin, and had paid nothing on those debts during the six months preceding the date of the stipulation. Norris testified that, as of the earlier filing date, he owed his mother $340,000; his cousin, $100,000; and the mortgage company, $125,000 or $130,000. In October 1994, Norris prepaid his note to the mortgage company for 12 or 13 months. He also paid some State taxes and paid $60,000 to the Internal Revenue Service. He paid his office rent six months in advance and overpaid utility and doctor bills. He had paid nothing on the $840,000 aggregate debt to the petitioning creditors.

Norris testified that, on the date the petition was filed, he was current on all of his debts, including those involved in running his household and law office. He testified further that the only debts he had not paid were those owed to the petitioning creditors.

- 15 -

The bankruptcy court found that Norris was not paying his debts as they became due at the time the petition was filed. It stated:

> Norris was in total default on his obligations to the three petitioning creditors. He has also failed to pay his mother, his cousin, the Clerk of Court, numerous other recurrent creditors, and most likely the IRS. His stealthy handling of his financial affairs is nothing more than a facade to create the artificial "illusion" of a debtor paying his debts. Norris' own actions have converted his once debt-free portfolio into a mountain of debt, thus leaving these creditors no other alternative but to turn to ... this Court.

*In re Norris*, 183 B.R. at 459.

Norris contends that many of the bankruptcy court's findings are clearly erroneous. He asserts that the debts to his mother and cousin were based on demand notes, and that those debts were not due because no payment demands had been made; that he owed nothing to the clerk of the state court, because the judgment for court costs was in favor of Johnson & Placke; and that there was no evidence of any debt to the IRS and that, because he paid the IRS over $60,000 in October 1994, it probably owed him money. He challenges also the bankruptcy court's findings regarding four small debts that he claims were not due at the time of the filing of the petition.

Even assuming *arguendo* that Norris is correct regarding the debts mentioned in the preceding paragraph, we nevertheless agree with the bankruptcy court that, on the date the petition was filed,

Norris was not generally paying his debts as they became due. "The term `generally' was not defined [in the Bankruptcy Code] in order to avoid the result suggested by [a] mechanical test ... and to give the bankruptcy courts enough leeway to be able to deal with the variety of situations that will arise." *All Media*, 5 B.R. at 143.

Pursuant to our assumption that the only debts Norris was not paying as they became due were those owed to the petitioning creditors, the bankruptcy court was entitled to consider the size of those debts ($840,000 in the aggregate) as compared to the size of the other significant debts on which we have assumed Norris was current (approximately $570,000, $440,000 of which was owed to relatives). *Id*. The court also was entitled to consider Norris' overall handling of his financial affairs, including the facts that (1) other than the debts owed the petitioning creditors, the largest debts owed by Norris were to his mother and cousin; (2) Norris incurred the obligations to his mother, cousin, and the mortgage company after the entry of the petitioning creditors' judgment against him and, in doing so, encumbered previously unencumbered property; and (3) Norris was current on his mortgage payments and other recurring obligations only because he had prepaid or overpaid them. *See In re Norris*, 183 B.R. at 457-58.[2]

_____

[2]   Norris asserts erroneously that the bankruptcy court applied the so-called "special circumstances exceptions" to the "almost per se rule" that a single creditor involved in a two-party

B.

The Bankruptcy Code provides that, subject to certain exceptions not applicable here, "an entity ... in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542. The bankruptcy court found that Norris had not been truthful about having burned approximately $500,000, that he was still in possession and control of the currency, and that it was property of the estate which could benefit Norris' creditors. *In re Norris*, 183 B.R. at 463. Therefore, it ordered Norris to turn over the currency to the trustee immediately. *Id*. Norris contends that the bankruptcy court erred by failing to apply the appropriate standard of proof, and that its finding that he was still in possession of the currency is clearly erroneous.

1.

Norris asserts that the bankruptcy court should have required the trustee to prove by clear and convincing evidence the requirements for entry of a turnover order. The bankruptcy court's opinion does not specify the standard utilized. Norris equates

_____

dispute with the debtor is ineligible for involuntary relief. Instead, the bankruptcy court stated that Norris' reliance on the "single creditor" rule was misplaced, because it had already determined that "Norris has unquestionably failed to pay more than one debt." *In re Norris*, 183 B.R. at 460.

this with the preponderance standard being applied and maintains that it placed the burden of proof on him, rather than on the trustee.

It is well-settled that, in turnover proceedings, the trustee must prove by clear and convincing evidence both that the property at issue is property of the bankruptcy estate and that it is in the possession of the party proceeded against. *E.g.*, **Maggio v. Zeitz (In re Luma Camera Service, Inc.)**, 333 U.S. 56, 64(1948); **Republic Nat'l Bank of Houston v. Sheinfeld (Matter of Goodson Steel Corp.)**, 488 F.2d 776, 778 (5th Cir. 1974); **Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.)**, 167 B.R. 640, 643 (D. Colo. 1994), *aff'd*, 75 F.3d 1447 (10th Cir. 1996). The bankruptcy court's omission of a reference to this well-known standard in its very thorough opinion does not support Norris' speculation that the court applied an incorrect standard.

2.

We also reject Norris' contention that the bankruptcy court clearly erred by finding that he was in possession of the allegedly burned currency. To repeat the well-known standard, a factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." **Anderson v. City of Bessemer City, N.C.**, 470 U.S. 564, 573 (1985) (citation omitted). "If the district court's account of

the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. at 573-74.

Norris admitted that he possessed $490,000 to $500,000 in $100 bills, but claimed that he had destroyed all of it by burning it in a trash barrel outside his home. The bankruptcy court, which had the opportunity to judge Norris' credibility after observing his testimony about the alleged incineration, gave an extremely detailed and comprehensive explanation for why it found Norris' bizarre tale unbelievable, and "unquestionably conclude[d] that Norris fabricated this all-encompassing and indeed phenomenal story." *See **In re Norris***, 183 B.R. at 460-62. We cannot say that this factual finding is clearly erroneous.

## C.

As noted, it appears that Norris was released recently. Our only record of this is the district court's 19 March 1997 order. Accordingly, although it may well be that the contempt issues are moot, we will address them.

Norris challenges the contempt order and the order denying his motions for other relief (stay, appointed counsel, appointment of experts, jury trial, etc.) on numerous grounds. He contends that

the bankruptcy court erred by refusing to appoint counsel, because his indigence was caused by the bankruptcy court's refusal to rule on whether he was entitled to his claimed exemptions, and he was denied effective *pro se* representation because he was not competent in bankruptcy law and, while incarcerated, was denied access to materials necessary to prepare an appeal brief; that his due process right to present the defense of present inability to comply with the turnover order was violated by the bankruptcy court's refusal to appoint and pay experts to analyze the garbage barrel in which he allegedly burned the currency; that the bankruptcy court erred by denying him a jury trial; that the bankruptcy court has no contempt power; that the contempt should be treated as criminal rather than civil because deprivation of his liberty was at stake; that the trustee had a conflict of interest and was therefore disqualified from being the movant in a contempt proceeding; and that the notice requirements of F.R.B.P. 9020 were violated because notice of the alleged contempt was given by the trustee.

"A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order." ***Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.***, 950 F.2d 1525, 1529 (11th Cir.), *cert. denied*, 506 U.S. 819 (1992). "Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his

failure on the grounds that he was unable to comply." *Id.* If the alleged contemnor makes a sufficient showing, the party seeking contempt has the burden of proving ability to comply. *Id.*

1.

Norris appeared at the contempt hearing without counsel, and requested that the court appoint him counsel. The bankruptcy court held that he was not entitled to appointed counsel because, as of the date of the hearing, he was represented by an experienced bankruptcy attorney who had not sought to withdraw. *In re Norris*, 192 B.R. 875. Needless to say, the bankruptcy court did not abuse its discretion.

The bankruptcy court cited *In re Fitzgerald*, 167 B.R. 689 (Bankr. N.D. Ga. 1994), for the proposition that an indigent debtor may have a right to appointed counsel if he may be deprived of his physical liberty if he loses, but it rejected Norris' claim of indigence because Norris' schedules reflected that he had adequate exempt assets with which to pay counsel. *In re Norris*, 192 B.R. at 875. Norris' contention that the bankruptcy court caused his indigence by refusing to rule on his claimed exemptions is without merit, because he did not seek such a ruling until months after the contempt hearing.

Norris' contention that he was denied effective *pro se* representation is also without merit. His asserted incompetence in bankruptcy law at the time of the contempt hearing is unavailing

because, as stated, his retained counsel had not withdrawn as of that date. And, there is no evidence in the record to support Norris' contention that he was denied access to legal materials while incarcerated.

2.

The bankruptcy court characterized Norris' request for appointment of additional expert witnesses for further examination of the alleged burn barrel as "nothing more than a late motion for reconsideration" of its finding, in the turnover order, that Norris had not incinerated the currency. We agree. In a contempt proceeding, it is inappropriate for a court to reconsider the legal or factual basis of the order claimed to have been disobeyed. *See Maggio v. Zeitz*, 333 U.S. at 69 (1948) ("It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy."); *CFTC v. Wellington*, 950 F.2d at 1528 ("The court will not reconsider the legal or factual basis of the order alleged to have been disobeyed."). Accordingly, the bankruptcy court did not err by refusing to appoint expert witnesses, and the district court did not err by refusing to conduct a *de novo* review of the factual basis for the turnover order when it reviewed the contempt order.

3.

There is no right to a jury trial in civil contempt cases. *See **United States v. Rylander***, 714 F.2d 996, 998, 1004 (9th Cir. 1983), *cert. denied*, 467 U.S. 1209 (1984); ***Hemmerle v. Bakst (In re Sun-Island Realty)***, 177 B.R. 391, 396 (S.D. Fla. 1994); *see also **Shillitani v. United States***, 384 U.S. 364 (1966) (citations omitted) ("The conditional nature of the imprisonment--based entirely upon the contemnor's continued defiance--justifies holding civil contempt proceedings absent the safeguards of indictment and jury, ... provided that the usual due process requirements are met.").

4.

Norris contends that the bankruptcy court had no power to issue a civil contempt order. In the alternative, he asserts that, in light of the serious consequences of long-term imprisonment, the civil contempt at issue should be treated as criminal contempt.

a.

The bankruptcy court did not hold that it had such contempt power. Instead, as noted, it made a report and recommendation pursuant to F.R.B.P. 9020(c), and the district court adopted it, in accordance with F.R.B.P. 9033.

Rule 9020(c) provides that an order of contempt

> shall be effective 10 days after service of the order and shall have the same force and effect as an order of contempt entered by the district court unless, within the 10 day period, the entity named therein serves and files objections prepared in the manner

- 24 -

> provided in Rule 9033(b). If timely
> objections are filed, the order shall be
> reviewed as provided in Rule 9033.

F.R.B.P. 9020(c). Rule 9033 provides, *inter alia*, that in non-core proceedings heard pursuant to 28 U.S.C. § 157(c)(1), the bankruptcy judge shall file proposed findings of fact and conclusions of law, to be served by the clerk on all parties; within 10 days after being served, a party "may serve and file with the clerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds" therefor; and the district court "shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made". F.R.B.P. 9033.

Although the bankruptcy court expressed doubt about the applicability of Rule 9033, based on its conclusion that the contempt proceeding was a core proceeding because it arose in the context of a turnover proceeding, which is also a core matter, it nevertheless decided, in light of the unsettled jurisprudence, to submit the contempt issues to the district court in the form of a report and recommendation for review pursuant to Rule 9033. *In re Norris*, 192 B.R. at 876. The bankruptcy court thus acted much as a magistrate judge would have on a matter assigned for a report and recommendation pursuant to 28 U.S.C. § 636. Although that procedure may have been unnecessary, it clearly was authorized by

F.R.B.P. 9020. (In any event, our court recently held that bankruptcy courts have power to conduct civil contempt proceedings and to issue orders in accordance with the outcome of those proceedings. *Placid Refining Co. v. Terrebonne Fuel & Lube*, ___ F.3d ___, 1997 WL 109400 (Fifth Cir. Mar. 27, 1997).)

### b.

We reject Norris' claim that the contempt order should be treated as criminal. Criminal contempt is "intended to vindicate the authority of the court." *Griffith v. Oles (Matter of Hipp)*, 895 F.2d 1503, 1515 (5th Cir. 1990). On the other hand, the purpose of civil contempt is either to compensate the party in whose favor the breached order was issued, or to coerce compliance with the order. *Id*. The contempt order is intended to coerce compliance with the turnover order; it provided for incarceration only if Norris did not purge himself of the contempt by complying with the turnover order within 10 days of the entry of the contempt order.

### 5.

Norris' reliance on *Hipp*, for the proposition that the trustee had a conflict of interest and, therefore, could not prosecute the contempt charges, is misplaced. *Hipp* involved a criminal contempt proceeding; our court's holding that the trustee had a conflict of interest was based on the distinction between criminal contempt proceedings, which are a separate and independent proceeding

between the public and the defendant, and not part of the case in which the violated order was issued, and civil contempt proceedings, which are between the original parties, and are instituted and tried as part of the main case. *Matter of Hipp*, 895 F.2d at 1509.

6.

Norris charges that the contempt order is invalid because the trustee, who gave notice of the contempt charges, is not listed among those authorized to give such notice in F.R.B.P. 9020(b). Rule 9020(b) provides that, for contempt not committed in the presence of the bankruptcy judge, notice of the charges "may be given on the court's own initiative or on application of the United States attorney or by an attorney appointed by the court for that purpose." F.R.B.P. 9020(b).

Even assuming *arguendo* that Rule 9020(b) was violated, Norris was not prejudiced. He received written notice of the charges and the time and place of the hearing, and he had a reasonable time to prepare his defense.

7.

Finally, Norris claims that the contempt order has subjected him to cruel, unusual, and excessive punishment. He maintains that, because he cannot comply with the turnover order, he has, in effect, been sentenced to life imprisonment.

We do not retreat from our holding that the bankruptcy court did not clearly err by finding that Norris fabricated his testimony regarding the incineration of the currency. Nonetheless, had he not been already released, we would have **REMANDED** the case to the district court for consideration of whether Norris' continued incarceration served the purpose of the civil contempt order. *See CFTC v. Wellington*, 950 F.2d at 1531 ("[w]hile each passing month of incarceration may strengthen [the contemnor's] claim of inability, ... many months or perhaps even several years may pass before it becomes necessary to conclude that incarceration will no longer serve the purpose of the civil contempt order."); *Simkin v. United States*, 715 F.2d 34, 37 (2d Cir. 1983) ("As long as the judge is satisfied that the coercive sanction might yet produce its intended result, the confinement may continue. But if the judge is persuaded ... that the contempt power has ceased to have a coercive effect, the civil contempt remedy should be ended."); *cf*. *United States ex rel. Thom v. Jenkins*, 760 F.2d 736, 740 (7th Cir. 1985) ("it can be assumed that at a certain point any man will come to value his liberty more than [the amount of money the contempt order requires him to pay] and the pride lost in admitting that he has lied").

Such remand would have been consistent with the contempt order, which provides that Norris "may otherwise purge himself of the contempt as determined by further orders of [the bankruptcy

court] or of the United States District Court." ***In re Norris***, 192 B.R. at 877.

### III.

For the foregoing reasons, the judgment is

***AFFIRMED.***